OPINION
{¶ 1} This is an appeal by defendant-appellant, Donald H. Brown, II, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas, following a jury trial in which appellant was found guilty of voluntary manslaughter.
 {¶ 2} On October 11, 2002, appellant was indicted on one count of murder, in violation of R.C. 2903.02. The indictment arose out of an incident on August 22, 2002, in which appellant fatally shot Joshua Green, age 18, at the Berwick Plaza Apartments located at 3094 Livingston Avenue.
 {¶ 3} The matter came for trial before a jury beginning on July 22, 2003. At trial, the state presented evidence tending to show the following facts. Veronica Green, the sister of the shooting victim, testified that her family lived in a gang neighborhood and her brother, Joshua, who was five foot four inches tall and weighed 117 pounds, had encountered difficulties with other individuals in the neighborhood "messing with him." (Tr. 92.) Approximately one month prior to the shooting, Joshua purchased a gun for protection from an individual nicknamed "New Orleans." (Tr. 109.)
 {¶ 4} On August 22, 2002, Veronica Green spent most of the day with her brother and she last saw him around 5:00 p.m. that afternoon. Later that evening, at approximately 8:00 p.m., Green received a phone call from her stepfather informing her that Joshua had been killed.
 {¶ 5} Macaette Robinson was a resident of the Berwick Plaza Apartments during the events in question. Appellant frequently visited the apartments, and Robinson was acquainted with him. Robinson also knew Joshua Green, and Robinson was aware that Green possessed a gun. Green kept the weapon in a sock on the seat of his car. According to Robinson, Green "felt like his life was being threatened in Easthaven." (Tr. 175.)
 {¶ 6} Robinson testified that Green visited the Berwick Plaza Apartments on August 22, 2002, and gave appellant a ride to a local drive-thru. After they returned to the apartments, Green discovered that his weapon was missing and he asked Robinson if he knew anything about the gun. Later that day, appellant showed Robinson the gun. Robinson subsequently informed Green that appellant had his weapon, but he advised Green, who was considerably smaller in stature and weight than appellant, to go home. Green eventually left, but he returned about 15 or 20 minutes later. After driving through the neighborhood, Green left again and went to the residence of a friend, Anson Ford.
 {¶ 7} Green told Ford he was upset because someone had stolen his gun at the Berwick Plaza Apartments. At one point during Green's visit, Ford left the room briefly to go to the restroom and, when he returned, Green was gone. Ford then discovered that a gun he kept in a drawer was missing, so he drove to the Berwick Plaza Apartments.
 {¶ 8} After leaving Ford's residence, Green returned to the Berwick Plaza Apartments and began arguing with appellant about the missing weapon. Appellant denied having the weapon, but Green observed the weapon on appellant and reached for the gun. Robinson asked appellant to "just give him the gun back." (Tr. 181.) Appellant looked at Robinson and stated, "[h]e's got to get out of the car and get it hisself." (Tr. 181.)
 {¶ 9} Robinson testified that appellant and Green began struggling over the weapon and "[a] round went off." (Tr. 181.) Green dropped the gun and appellant fell backwards. Appellant then got up and "rushed towards the car as Josh was reaching down for the weapon." (Tr. 181.) Appellant overpowered Green by lifting him and punching him. After the last punch, "Josh slumped down in the vehicle and went to raise up back out of the vehicle, and that's when a couple shots went off." (Tr. 181-182.) Appellant was in control of the weapon at the time the shots were fired. After the shooting, appellant went into the apartment building and knocked on Robinson's door, but Robinson refused to let appellant inside his apartment. Robinson phoned 911 to seek help for Green.
 {¶ 10} Ford also testified regarding the shooting incident. When Ford arrived at the apartments, he observed Green "struggling, getting hit. He wasn't in control. He was — he had his hand, like, out the car window * * *. His arm was being held down, and he was being punched." (Tr. 137.) Appellant was holding Green's arm with one hand, and punching Green in the head with the other hand Green had a gun in his right hand According to Ford, Green was attempting to get away from appellant but was overpowered because "[h]e's a real little guy." (Tr. 143.)
 {¶ 11} Appellant, who was pulling at Green, then fell with the gun in his hand, "got up, said, `Fuck you, motherfucker' [and] [s]hot two times." (Tr. 138.) Appellant was approximately one foot away from Green, near the car window, when he fired the shots. Appellant "fired the first shot at the passenger window, took a few steps towards the back, and shot at the side back window" on the driver's side. (Tr. 140.) According to Ford, there was an interval of approximately five to seven seconds between the shots.
 {¶ 12} Appellant then walked into the apartment building. Ford ran over to the car, put his right hand on Green's shoulder and "knew he was dead." (Tr. 141.) Ford phoned the police and waited by his friend's car. The engine was still running, and Ford noted that the transmission was in "park." Just after the shooting, Ford heard the engine "rev up" from Green's foot pushing down on the accelerator. (Tr. 143.)
 {¶ 13} Ford stated that, during the altercation, appellant "could have stopped at any time. He was in control of the situation." (Tr. 144.) After the incident, Ford described the assailant to police officers as an individual approximately six foot two inches in height, weighing between 230 and 250 pounds. Ford was subsequently contacted by police detectives and shown a photo array, and he picked out a photograph from the array. Ford testified that the weapon he saw appellant take from Green's hand was the .38 caliber revolver that he (Ford) owned.
 {¶ 14} Columbus Police Officer Napoleon Bell was one of the first officers dispatched to 3094 East Livingston Avenue following the shooting. When he arrived at the scene, Officer Bell observed a shooting victim slumped over in a vehicle. The car engine was running when the officer arrived, and he turned the engine off "because it was grinding," and he "thought it might go into gear." (Tr. 36.) The officer did not notice any indication of breathing by the victim who was subsequently pronounced dead at the scene.
 {¶ 15} Columbus Police detectives collected various items from the victim's vehicle, including a cell phone, and a white sock containing six bullets. The sock and bullets were recovered from the middle console area. The officers did not find any weapons in the victim's car.
 {¶ 16} At trial, the prosecution presented the videotaped testimony of Dr. Keith N. Norton, Deputy Coroner with the Franklin County Coroner's Office, who had performed an autopsy of the shooting victim. Dr. Norton described three separate gunshot wounds to the victim. He first noted a gunshot wound on the left side of the victim's head, behind the left ear. The presence of soot on the inside surface of the skull indicated that the weapon was either in contact with the skin or very close to the skin. Dr. Norton opined that the cause of death was the head wound, which extended to the base of the victim's skull and damaged part of the spinal cord.
 {¶ 17} Dr. Norton noted two other gunshot wounds to the victim's left upper shoulder. One of the shoulder wounds passed through the victim's neck. Dr. Norton opined that both of the shoulder wounds, which were non-lethal, were also fired within close range of the victim. All three wounds entered the victim's left side. A toxicology report indicated that the victim had .08 grams percent of alcohol in his blood, and he also tested positive for the presence of marijuana.
 {¶ 18} Appellant testified on his own behalf and gave the following account of the events on August 22, 2002. On that date, appellant resided at the Greenbriar Apartments, located at 3082 Columbus Avenue. At approximately 3:30 p.m., Macaette Robinson and appellant's cousin, Donnie Stevens, came to appellant's apartment, woke him up and asked him to get in their car for a ride.
 {¶ 19} Eventually, they drove to the Bexley Plaza Apartments. According to appellant, he began helping an individual he identified as George, who was getting ready to move out of the apartment complex. Joshua Green, who was also at the apartment complex, approached appellant and asked him about a pistol; appellant told Green he did not have the weapon. Appellant and George later left for approximately 45 minutes. When they returned, Green approached him again, and "says everybody says that I have his gun. I told him I don't have his gun." (Tr. 295.) Appellant then went to his car and left the parking lot in a hurry, stating that he would be back. Appellant denied that Green drove him to a drive-thru that day; rather, appellant stated that he walked to the drive-thru to get a "Black Mild" cigar. (Tr. 294.)
 {¶ 20} Appellant was drinking beer with Stevens, Robinson and two other individuals when Green returned about 20 minutes later. Green said to appellant, "[c]ome here, let me talk to you." (Tr. 296.) Appellant went over toward Green's car, and Green again asked appellant about a gun. Appellant told Green he did not have the gun, and Green became angry, and "his voice is slurred." (Tr. 297.) Green said to appellant, "I know you have my pistol, and I want you to give me my damn pistol." (Tr. 297.) According to appellant, "[w]hen I tell him I don't have his pistol and try to walk away from the car, walk away from him again, that's when I seen him reach beside him on the side of the seat and produce a pistol and shoot." (Tr. 297.) Appellant stated that Green shot twice, the first time while appellant was pushing Green's hand away from him, and the second time while appellant had both hands on the weapon.
 {¶ 21} As the two men struggled over the weapon, appellant managed to position his thumb and finger between the hammer and firing pin of the revolver. Appellant related that, on a prior occasion, he had been shot in the stomach, so "I actually was not myself after he shot at me. I was scared for my life." (Tr. 298-299.) Green started to bite appellant on the arm and, in response, appellant punched Green on top of his head with his right fist. Appellant stated he was both scared and angry. Eventually, appellant pulled his arm free from Green and pulled the gun out of his hand Appellant fell backwards to the ground, and then "rose up off the ground" and "shot him twice in the side." (Tr. 301.) According to appellant, at the time he was shooting, Green was reaching down by the console of the car "where he first produced the first gun from, so I'm still in fear of my life." (Tr. 301.) Appellant fired another shot and took off running. Appellant stated that he fled the shooting scene and did not turn himself into police because he was on probation and was scared for his life. Appellant believed that, if he had turned and walked away after wrestling the gun away, Green would have shot him in the back.
 {¶ 22} On cross-examination, appellant stated he did not know where the individual named George was moving because "[w]e never made it to that destination. We had rode for 45 minutes, and he turned around, dropped me back off, `cause something had happened." (Tr. 309.) According to appellant, Green broke the glass in the back window of the car by shooting at him. Appellant, who stated he weighed 245 pounds, acknowledged that, after shooting Green twice, he said "Fuck you, motherfucker," prior to firing the final shot. (Tr. 320.) Appellant denied knowing that the gun was pointed at Green's head when he fired the last shot. When asked what he did with the weapon, which was never recovered, appellant stated that he threw it in a trash can as he was running from the scene. Appellant denied stopping at Robinson's apartment after the shooting incident. Rather, he stated that he went back to his apartment and fell asleep.
 {¶ 23} The jury returned a verdict finding appellant guilty of voluntary manslaughter. The trial court sentenced appellant by judgment entry filed on July 29, 2003.
 {¶ 24} On appeal, appellant sets forth the following three assignments of error for review:
Assignment of Error No. 1:
The trial court erred in entering a judgment of conviction because the jury's verdict was not supported by sufficient evidence and was against the manifest weight of the evidence.
Assignment of Error No. 2:
The trial court erred in imposing the maximum sentence upon appellant without complying with the statutory requirements of R.C. Chapter 2929.
Assignment of Error No. 3
The trial court erred in journalizing a defective sentencing entry, requiring remand for a new sentencing hearing.
 {¶ 25} Under his first assignment of error, appellant asserts that his conviction was based upon insufficient evidence and was against the manifest weight of the evidence.
 {¶ 26} As noted by appellant, sufficiency of the evidence and weight of the evidence are distinct legal concepts. In State v.Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617, at ¶ 30-31, this court discussed those distinctions as follows:
To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proven beyond a reasonable doubt. * * * Sufficiency is a test of adequacy, a question of law. * * * We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. * * * We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. * * * A conviction based upon legally insufficient evidence amounts to a denial of due process * * * and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant. * * *
A manifest weight argument, by contrast, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. * * * Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. * * * Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * *
 {¶ 27} R.C. 2903.03(A) defines the offense of voluntary manslaughter, and states in pertinent part:
No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.
 {¶ 28} In asserting that there was insufficient evidence to support his conviction, appellant contends that the prosecution failed to establish that he acted with any intent other than to defend himself from Green. We disagree.
 {¶ 29} In construing the evidence most strongly in favor of the state, as we are required to do in addressing a sufficiency argument, the testimony at trial established that appellant shot Green three times at close range. Specifically, after first struggling with Green over control of a weapon, appellant fell to the ground with the gun in his hand Appellant rose up and, by his own admission, immediately fired two shots "in the [victim's] midsection." (Tr. 301.) Both of those shots struck Green in his left shoulder. According to the testimony of one of the witnesses, after a pause of approximately five to seven seconds, appellant fired the last, fatal shot to the back of Green's head. Appellant acknowledged during cross-examination that, after firing the first two shots, he stated "Fuck you, motherfucker," as he fired the third shot. After the shooting incident, appellant fled the scene and disposed of the weapon.
 {¶ 30} As noted, appellant's primary contention is that he acted within his rights in killing Green. In order to meet the burden of proving self-defense, "the defendant must establish in part a bona fide belief that he was in imminent danger of death or great bodily injury." State v. Greene, Mahoning App. No. 02 CA 122, 2004-Ohio-1540, at ¶ 7.
 {¶ 31} In the present case, there was evidence by the state that undermined appellant's claim of self-defense, including the time interval (approximately five to seven seconds) between the initial non-lethal shots and the third fatal shot, as well as the location of the fatal wound (shot at close range, with the weapon either in contact or very close to the skull, entering the back of the victim's head). The firing of multiple shots also undercuts a claim of self-defense. State v. Palmer (1997),80 Ohio St.3d 543, 564. Further, according to the testimony of one of the state's witnesses, Ford, appellant was in control of the situation and could have "stopped at any time." Similarly, another eyewitness, Robinson, testified that, after appellant retrieved the weapon in the struggle with Green, there was nothing to prevent appellant from running away.
 {¶ 32} Here, even assuming that appellant was justified in firing the first two nonlethal shots, the trier of fact could have concluded that appellant did not have a bona fide belief that he was in imminent danger of death or great bodily injury at the time he fired the last fatal shot; rather, the jury could have reasonably found that appellant had time to reflect before knowingly firing the final shot to the back of the victim's head, causing his death. Accordingly, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the elements of voluntary manslaughter beyond a reasonable doubt, while rejecting appellant's claim of self-defense.
 {¶ 33} Regarding appellant's manifest weight argument, this court's review of the evidence fails to show that the jury lost its way or created a manifest miscarriage of justice. The trier of fact was not required to believe appellant's testimony that he shot Green in self-defense. Again, even if the jury may have reasonably found that appellant fired the first two shots at a time when he believed he was in imminent danger of bodily harm, it likewise could have found that the final shot to the back of the victim's head was not necessary to further his defense. As noted by the state, appellant's testimony conflicted with the testimony of Robinson and Ford, who both observed appellant physically overpowering Green prior to shots being fired. Additionally, appellant's testimony that a total of five shots were fired was contrary to that of Robinson and Ford, who only heard two or three shots. Further, the physical evidence did not comport with appellant's claim that Green shot out the back window of his vehicle, as the evidence indicated that most of the shattered window glass remained on the inside of the car. Upon review, we find that the jury did not lose its way by choosing to believe the version of events presented by the state's witnesses rather than appellant's, and we conclude that appellant's conviction for voluntary manslaughter was not against the manifest weight of the evidence.
 {¶ 34} Based upon the foregoing, appellant's first assignment of error is without merit and is overruled.
 {¶ 35} Under his second assignment of error, appellant asserts that the trial court erred in imposing the maximum sentence without complying with the statutory requirements of R.C. Chapter 2929.
 {¶ 36} In State v. Craddock, Cuyahoga App. No. 82870, 2004-Ohio-627, at ¶ 19-21, the court discussed the requirements for a sentencing court in imposing a maximum term as follows:
In order for a trial court to impose the maximum sentence, it must make the required findings set forth in R.C. 2929.14(C), which provides in relevant part: "[T]he court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst form of the offense, [and] upon offenders who pose the greatest likelihood of committing future crimes."
In State v. Edmondson (1999), 86 Ohio St.3d 324, 329,715 N.E.2d 131, the Supreme Court of Ohio held that in order to lawfully impose a maximum prison sentence, the record must reflect that the trial court found the defendant satisfied at least one of the criteria set forth in R.C. 2929.14(C). It is not necessary for the trial court to use the exact language of R.C.2929.14(C), as long as it is clear from the record that the court made the required findings. State v. Hollander (2001),144 Ohio App.3d 565, 760 N.E.2d 929.
In addition, R.C. 2929.19(B) requires the trial court to "make a finding that gives its reasons for selecting the sentence imposed," and if that sentence is the maximum term allowed for that offense, the judge must set forth "reasons for imposing the maximum prison term." Failure to enumerate the findings behind the sentence constitutes reversible error. Edmondson,86 Ohio St.3d at 329, 715 N.E.2d 131.
 {¶ 37} The state concedes that the trial court failed to make necessary findings to support a maximum sentence, and that this matter should be remanded for resentencing. Upon review of the record, we agree that the court did not make the requisite findings before imposing the maximum sentence, and we therefore sustain appellant's second assignment of error and remand this matter for resentencing.
 {¶ 38} Under the third assignment of error, appellant asserts that the trial court erred in journalizing a defective sentencing entry. Specifically, appellant argues in part that the court's entry incorrectly characterizes voluntary manslaughter as a "lesser-included" offense of murder (rather than an inferior degree offense). Appellant also challenges language in the court's entry stating "[t]he Court found the Defendant guilty of the charges to which the plea was entered." Appellant maintains that this statement was erroneous because a jury found appellant guilty, and the record contains no support for a reference to an additional finding of guilt to a "plea."
 {¶ 39} In light of our determination that this matter should be remanded for resentencing, the issues raised, challenging certain language in the trial court's sentencing entry, are rendered moot. However, because the trial court will necessarily be journalizing a new sentencing entry, we note our agreement with appellant that voluntary manslaughter is an inferior degree of murder. See State v. Shane (1992), 63 Ohio St.3d 630, 632.
 {¶ 40} Based upon the foregoing, appellant's first assignment of error is overruled, appellant's second assignment of error is sustained and appellant's third assignment of error is rendered moot. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to that court for resentencing.
Judgment affirmed in part, reversed in part; and causeremanded.
Bryant and Sadler, JJ., concur.