OPINION
{¶ 1} Defendant-appellant, Kevin G. Madden, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of murder in violation of R.C. 2903.01, with a firearm specification pursuant to R.C. 2941.145. Because the trial court properly refused to instruct on the offense of voluntary manslaughter, and because the jury properly could reject defendant's affirmative defense of self-defense, we affirm.
 {¶ 2} By indictment filed July 18, 2003, defendant was charged with one count of aggravated murder with prior calculation and design, including a firearm specification, in the death of Tabari Patterson. Following multiple continuances, occasioned in part by defendant's request for a change of counsel, the charge was tried to a jury beginning January 10, 2005. During the course of the trial, counsel and the trial court discussed jury instructions and tentatively concluded that the jury be instructed on the lesser included offense of murder, as well as the affirmative defense of self-defense. At the conclusion of the evidence, defendant further asked for instructions on the offenses of felonious assault, voluntary manslaughter, and involuntary manslaughter; the trial court refused the additional instructions. The jury returned a verdict of not guilty on the indicted charge, but guilty of the lesser included offense of murder, as well as the firearm specification. The trial court sentenced defendant to 15 years to life, plus three years for the firearm specification.
 {¶ 3} Defendant appeals, assigning two errors:
First Assignment of Error
The trial court committed reversible error by failing to instruct the jury on the lesser included offense of voluntary manslaughter when the instruction was warranted by the facts.
Second Assignment of Error
Appellant's conviction is against the manifest weight of the evidence, because Appellant established the affirmative defense of self-defense by a preponderance of the evidence.
 {¶ 4} Because defendant's two assignments of error are fact intensive, we set forth in some detail the facts presented to the jury. According to the state's evidence, on July 10, 2003, defendant and four individuals, Dezjuano Mack, Howard Bryant, Anthony Graves, and Louis Russell, began the evening with dinner and drinks at Genji's. After eating and drinking for an hour or two, the group went to a bar, the Sunrise, where they did not stay long. From the Sunrise, the group went to the Knotty Pine, and then to Playaz Club in Westerville.
 {¶ 5} Some members of the group entered Playaz Club. Although the witnesses offered conflicting testimony identifying who went inside, the testimony was uniform that defendant did not go into the club. Bryant entered the club but would occasionally leave to talk to someone in the parking lot and then return to the club. Both Mack and Howard testified they saw Tabari Patterson inside Playaz Club, though they did not see Patterson, or anyone else, with a gun.
 {¶ 6} At some point, Bryant saw defendant by the door, and defendant said, "[L]et's go." (Tr. 77.) Although defendant was ready to leave, Bryant was still socializing outside in the parking lot. As he and Mack were talking to a female patron, Bryant heard gunshots. Bryant ducked and saw Graves running toward their van. Graves hollered, "Come on. Let's go." (Tr. 85.) Bryant jumped in first, then Mack entered the van. While they were still in the parking lot, Bryant heard more shots; Mack testified that as they were pulling out, he, too, heard more gunshots in the background. Graves, on the other hand, testified they were being shot at as they drove away.
 {¶ 7} As they drove southbound on Joyce Avenue, defendant ran toward the van. Graves stopped the van, and defendant got in; he was nervous and distraught. Graves saw the gun in defendant's hand when defendant entered the van; defendant dropped it to the floor and pushed it toward the front passenger seat. Defendant said "you all seen me do it" or "you all was the only ones who seen me do it." (Tr. 151.) Similarly, Bryant testified he knew defendant had a gun because defendant either put it on the floor or pushed it; Bryant did not see it, but heard the occupants talking about it as if no one wanted to touch it. Both Bryant and Graves testified the men with Patterson had guns; Bryant believed Patterson in the past carried a gun.
 {¶ 8} Officer Tennis Jude, of the Columbus Police Department, heard the gunshots; he saw a van stop in the middle of Joyce Avenue, an individual get in the van, and the van then continue southbound on Joyce Avenue. Jude was suspicious, so he followed the van, which at the time four individuals occupied, and stopped it. Most of the occupants cooperated with the police, but defendant seemed to ignore commands to cooperate. Ultimately, a Glock brand model 17 semi-automatic pistol was found on the floor underneath the passenger's seat in front of defendant's place in the van. The magazine, loaded with 12 cartridges, was discovered under the seat. As the officers were getting the men out of the van, they received confirmation of the shooting.
 {¶ 9} On arriving at Playaz Club, Sergeant Travis Corbin, of the Clinton Township Police Department, found the dead body of Tabari Patterson lying between two cars, and a large crowd was gathered around it. Although medics were called, Travis believed Patterson to be dead at the time the officer arrived. A Dodge Dynasty parked east of where the victim was found had a .45 caliber handgun under the front seat; the magazine was full, and no bullet was in the chamber.
 {¶ 10} William Mark, a firearms examiner with the Bureau of Criminal Investigation, examined the shell casings found at the scene, as well as the Glock semi-automatic pistol. According to Mark, the gun will hold 19 bullets, 18 in the magazine and one in the chamber. When he received the items, the magazine had 14 unfired cartridges, and the chamber firing pin had one, for a total of 15. He examined four of the casings, found they had Glock characteristics, and concluded the four came from the Glock gun found in the van.
 {¶ 11} According to Dr. Dorothy Dean, of the Franklin County Coroner's office, the victim died from four gunshot wounds to the head that perforated the brain and brain stem. All four wounds could have caused the victim's death; she could not identify one as the cause of death.
 {¶ 12} Detective James Simmons, of the Franklin County Sheriff's Office, interviewed defendant the next morning. Simmons testified that defendant was nervous throughout the interview, but pressed that he wanted to make a statement. According to that statement, defendant sat in the van while some of the others went into Playaz Club. When they came outside the club to speak with women in the parking lot, defendant joined them. Defendant saw Patterson exit the club, mouth something to defendant, and then walk to a car. Defendant told Simmons he had received murderous threats from Patterson prior to the evening at the Playaz Club, he believed Patterson was going to get a gun to follow through with the threat, and he needed to act before Patterson did. Accordingly, defendant "did what he had to do." Defendant never told Simmons that Patterson had a gun or that someone fired at him first.
 {¶ 13} Defendant testified on his own behalf. According to defendant, he at one time was employed with Time Warner, but stopped because he was sent to work in the Short North area where Patterson lived. Defendant explained that problems developed between him and Patterson through defendant's act of generosity. Specifically, defendant said that due to a car accident, he went to a chiropractor where he first saw Patterson. Because Patterson needed money, defendant loaned him $20. When defendant later saw Patterson at the Hoop basketball court, he asked Patterson for the money. Patterson angrily responded, "I'm a killer. I don't pay money back; I kill them." (Tr. 365.) As he walked away, Patterson said "[y]ou, your brother, and your cousin, you all are B's." (Tr. 368.) When asked at trial what the "B" stood for, defendant testified it meant "bitch." In response to Patterson's comment, defendant's brother engaged Patterson in a fist fight. After the fight with defendant's brother, Patterson said, "I know where you live at. I'm going to come and get you." (Tr. 376.)
 {¶ 14} Defendant testified the victim was intimidating when he spoke, and defendant believed him capable of violence. Indeed, defendant's cousin, a close friend of Patterson, told defendant that Patterson, carrying an AK-47, came to the home of defendant's cousin and said he was going to shoot defendant. On defendant's next visit to the chiropractic office, he saw Patterson and left before receiving treatment because he wanted to avoid trouble.
 {¶ 15} According to defendant, he went back to the Hoops basketball gymnasium one time after the confrontation with Patterson, saw Patterson, turned around, and left. When Patterson came to defendant's house to see defendant's cousin, Patterson told defendant to come outside. Defendant refused because Patterson showed him a gun. As a result of the incident, defendant moved to Hilliard.
 {¶ 16} A month or two later, defendant returned to Columbus for his cousin's birthday and stopped at a gas station on 5th Avenue. Defendant turned around after paying, and Patterson was behind him. Defendant said "hi," and Patterson bumped defendant on his shoulder. Defendant interpreted the gesture to mean Patterson still had a problem with defendant. As a result, defendant left without putting any gasoline in his car even though he had paid for it. Patterson followed defendant from the gas station and began shooting at defendant's car; a bullet hit the car's license plate, but did not strike defendant. Defendant did not report the incident to the police right away, because he was afraid such action would worsen the situation. Several weeks later, a police officer questioned defendant about a handgun in his car, and defendant reported the shooting incident as justification for carrying the gun.
 {¶ 17} The next time defendant saw Patterson was on July 10, 2003, at Playaz Club. On that night, defendant met Mack, Bryant, Graves and Simmons at a bar, where defendant, armed with a gun, left his car. The group eventually ended up at Playaz Club, but defendant did not go inside because he had no money. He was not looking for Patterson and did not know he would find him.
 {¶ 18} At some point, defendant told the others the hour was getting late and he wanted to leave. Defendant, for the first time that evening, saw Patterson: defendant was in the parking lot and Patterson was coming out of the hallway entrance to Playaz Club. When Patterson saw defendant, he said "I told you not to come back outside * * * I'm going to get you this time. I won't miss you this time." (Tr. 392.) Defendant asked what the problem was and why Patterson wanted to shoot him. Patterson still threatened. Patterson went to his car to get his gun, approached defendant, and shot at defendant; defendant returned fire. A man wearing a red hat, who actually initiated the shooting, fired again. Afraid, defendant shot fast and believes he knew he hit Patterson. When the man wearing the red hat ducked behind a car, defendant ran across the street, as he was afraid for his life. According to defendant, he considered the situation a life or death matter, and his actions were a reaction to his life being in danger.
 {¶ 19} Within the context of those facts, defendant's first assignment of error contends the trial court erred in failing to instruct the jury on voluntary manslaughter, an offense of inferior degree to murder. Under R.C. 2903.03(A), a person is guilty of voluntary manslaughter if, "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force," he or she knowingly causes the death of another.
 {¶ 20} "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." State v. Deem (1988),40 Ohio St.3d 205, paragraph five of the syllabus.
 {¶ 21} To ascertain whether the requisite provocation exists, "[a]n inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components. In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." Statev. Shane (1992), 63 Ohio St.3d 630, 634. See, also, State v.Wong (1994), 95 Ohio App.3d 39, 51-52, dismissed, appeal not allowed, 70 Ohio St.3d 1455.
 {¶ 22} "If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction." Id. Ordinarily, "[w]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." State v. Mack (1998),82 Ohio St.3d 198, 201. Similarly, "past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off." Id.
 {¶ 23} Here, defendant's evidence, construed in defendant's favor, demonstrated prior incidents between him and Patterson. They had physical contact, Patterson threatened defendant, and Patterson shot at defendant's vehicle as he left a 5th Avenue gas station. On the evening of the incident, defendant saw Patterson coming out of the hallway entrance to Playaz Club, and again Patterson spoke threatening words to defendant. Patterson then went to his car, retrieved his gun, approached defendant, and shot at him.
 {¶ 24} Presented with those facts, the trial court did not err in refusing to instruct the jury on voluntary manslaughter. Although the evidence revealed prior incidents between defendant and Patterson, those incidents preceded the July 2003 shooting by an unspecified period of time. Because defendant had time to cool off from the prior incidents, they do not satisfy the test for reasonably sufficient provocation. Mack, supra.
 {¶ 25} On the day of the incident, Patterson not only threatened defendant, but retrieved and used a gun against defendant. Even if we were to assume such action, when combined with the ongoing dispute between defendant and Patterson, objectively constitutes sufficient provocation, the issue resolves to applying the subjective standard and determining whether defendant was actually under the influence of sudden passion or a sudden fit of rage.
 {¶ 26} Defendant did not testify he was enraged, but rather he was "very much scared," (Tr. 434) he was "scared for [his] life," (Tr. 395) and he "believed he was in `a life or death situation.'" (Tr. 397.) See State v. Collins (1994),97 Ohio App.3d 438 (noting that defendant's "own testimony did not support and completely undermined any claim that his actions were in fact incited by serious provocation," as defendant did not testify he was provoked, angry or had lost control of his temper). Defendant's "claim that he feared for his own safety did not constitute sudden passion or rage" under the statute. Statev. Caldwell (Dec. 17, 1998), Franklin App. No. 98AP-165 (concluding that where the defendant acted out of fear rather than rage, the trial court did not err in refusing to instruct the jury on voluntary manslaughter); Mack, at 201 (noting that "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage"); State v. Perdue, 153 Ohio App.3d 213, 2003-Ohio-3481
(noting that evidence of defendant's fear was insufficient to support provocation under voluntary manslaughter). Because the evidence fails to demonstrate the requisite subjective provocation, the trial court did not err in refusing defendant's instruction of voluntary manslaughter. Defendant's first assignment of error is overruled.
 {¶ 27} Defendant's second assignment of error contends his conviction is against the manifest weight of the evidence. While defendant does not dispute that he caused the victim's death, defendant contends the evidence demonstrates he acted in self-defense, and the jury's contrary verdict is against the manifest weight of the evidence.
 {¶ 28} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonably minds to find guilty beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380,387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"); State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. Determinations of credibility and weight of the testimony remains in the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 29} To justify the use of deadly force in defending himself, defendant was required to prove by a preponderance of the evidence that: "(1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has the bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger." State v.Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus. Here, even if we were to assume that defendant's testimony supports each of the prongs of self-defense, other evidence contradicted defendant's testimony. Thus, the strength of defendant's affirmative defense rested on defendant's credibility, and the evidence presented grounds that allowed the jury to find defendant's testimony lacking in credibility.
 {¶ 30} More specifically, defendant testified that Patterson, armed with a gun, first fired at defendant; defendant only returned fire. Contrary to his testimony at trial, however, defendant told Detective Simmons the morning after the incident that he felt Patterson was going to get a gun. As a result, defendant said he approached Patterson, needing to act before Patterson did, and "did what I had to do." (Tr. 324.) Moreover, defendant's ability to fire four shots into Patterson's head, one from the back, and others from the front, detracts from defendant's claim that he acted quickly in an effort to defend himself. State v. Brown, Franklin App. No. 03AP-858,2004-Ohio-5064, at ¶ 31 (stating that "firing of multiple shots also undercuts a claim of self-defense"); State v. Palmer
(1997), 80 Ohio St.3d 543, 564. Further harming defendant's self-defense claim was the absence of a gun near the victim's body.
 {¶ 31} Defendant attempted to explain some of the discrepancies. For example, defendant's attorney asked him about his statement to Detective Simmons. In response, defendant testified, "I told him he went to get his gun, so I took that as letting him know he went and got his gun and had a gun." (Tr. 397.) The jury, however, was not required to accept defendant's explanation. In addition, the prosecution impeached defendant's testimony in other respects. Cross-examination pointed out that defendant's statement to Simmons not only failed to mention that Patterson retrieved his gun, but also did not mention the male wearing the red hat or Patterson's firing first. The prosecution's inquiry further noted defendant told Detective Simmons that he walked away after firing the shots, while he told the jury he ran away. Such discrepancies allowed the jury to weigh defendant's credibility, and we cannot conclude the jury lost its way in finding defendant's testimony unpersuasive.
 {¶ 32} We recognize the evidence showed Patterson had gun residue on his right hand, but the evidence also showed Mack had gun residue on his right hand, despite no other evidence indicating Mack possessed a gun that evening. While the gun residue on Patterson's hand could support defendant's testimony, it does not necessarily do so, as the stipulation before the jury stated that "[t]he presence of gunshot primer residue on a person's hands is consistent with that individual having discharged a firearm, having been in the vicinity of a firearm when it was discharged, or having handled an item with gunshot primer residue on it." (Tr. 274.) As a result, the gun residue evidence is not enough, in light of the other evidence impeaching defendant's testimony, to reverse the jury's implicit finding that defendant failed to prove self-defense. Defendant's second assignment of error is overruled.
 {¶ 33} Having overruled both of defendant's assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
Petree and Sadler, JJ., concur.