OPINION
{¶ 1} This is an appeal by defendant-appellant, Tommy L. Hall, from a judgment of the Franklin County Court of Common Pleas following a jury trial in which appellant was found guilty of murder and attempted murder.
 {¶ 2} On February 18, 2003, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, and one count of attempted aggravated murder, in violation of R.C. 2923.02. Both counts carried firearm specifications. The indictment arose out of an incident on February 8, 2003, in the parking lot of a nightclub, in which appellant fired nine shots from a handgun, killing Tommy Lucas, and wounding Ricky Turner. At trial, appellant admitted to firing the shots but claimed that he acted in selfdefense.
 {¶ 3} The matter came for trial before a jury beginning on October 6, 2003. During its case-in-chief, the state presented evidence tending to show the following: on February 7, 2003, Ricky Turner, age 23, was with his brother, Jimmy Turner, and a group of friends, including Mike Fuller, Eddie Rife, Tommy Lucas, age 17, and Anthony Wright. The group drove in several vehicles to "Sirens," a strip club located on Cleveland Avenue.
 {¶ 4} After about an hour, the group left Sirens and drove to another strip club, "Solid Gold." Fuller, however, did not have identification, so they drove to a third club, the "Doll House," located at 1680 Karl Court.
 {¶ 5} They arrived at the Doll House around midnight; once inside, members of Turner's group recognized an individual named Joseph Epling, who was with another group, including Chester Browning and Vic Tantarelli. Rife had been involved in a confrontation with Epling on an earlier occasion, so on this evening, Rife went over to Epling to attempt to "smooth everything out" so that "everybody could have a good time." (Tr. at 154.) Employees of the club asked them to step outside, so Rife, Epling and others, including Ricky Turner and Wright, went out to the parking lot. When Turner and Wright observed that Rife and Epling appeared to be getting along, they went back into the club.
 {¶ 6} Inside the club, Tantarelli appeared to be drunk. Fuller testified that Tantarelli had a bottle in his hand and was "bickering" back and forth with Jimmy Turner; eventually, Jimmy Turner struck Tantarelli in the face, knocking him to the ground. Ricky Turner's group then decided to leave the club and go somewhere else.
 {¶ 7} Rife was still outside with Epling when the rest of Turner's group came outside. Rife testified that Jimmy Turner came out of the club and boasted "he had just hit somebody inside the club and * * * he came out real rowdy, oh, yeah, I just hit him." (Tr. at 157.) Epling responded, "you shouldn't have done that." (Tr. at 157.) Epling then walked back inside the club.
 {¶ 8} As Ricky Turner came outside, he noticed appellant and his brother, Timmy Hall. According to Fuller, Timmy Hall was "standing there staring at us with his hands in his pocket." (Tr. at 232.) Turner recalled that appellant then "just walked off into the shadow." (Tr. at 48.)
 {¶ 9} Turner and Timmy Hall began arguing. Rife testified that "Ricky looked at him and asked him what he was staring at and Timmy looked back at him and they * * * started arguing about who was tougher, * * * they are not afraid to die, who is afraid to die and who's not." (Tr. at 168-169.) Ricky Turner testified that he and Hall began "talking stuff" in an angry manner. (Tr. at 48.) Hall "was just screaming off nonsense like, I am not afraid to die, this and this and that. I'm like — I said it, too, I am not afraid to die either." (Tr. at 49.) Turner thought he was going to get into a fight, so he gave Lucas his car keys and told him to get in his car. Fuller, who was watching Turner and Hall argue, placed a 911 call on a cell phone and reported that he thought an individual had a weapon.
 {¶ 10} Turner did not observe Timmy Hall with a weapon; however, because Hall and appellant had approached Turner's group "like they had a gun," Turner said to Timmy Hall, "they didn't stop making guns when they made yours." (Tr. at 50.) Turner then began walking toward his car, believing the altercation was over.
 {¶ 11} During this time, Rife had started his vehicle and drove near the entrance to the club. Wright and Fuller both observed appellant come running up and bump into his brother. According to Fuller, appellant came running from the outside of the parking lot up into the parking lot area. Wright then yelled to Turner, "Rick, he's got a gun." (Tr. at 115.) Turner began running, and appellant ran after him and began firing the weapon.
 {¶ 12} Turner testified that, as he was running toward his car, one of the shots struck him in the buttocks, causing him to fall to the ground. Turner then "heard somebody run up and just started shooting. And I'm begging for my life." (Tr. at 54.) Turner did not know who was shooting at him, but he was shot several more times. According to Turner, his assailant was "shooting over top of me, he was right over top of me." (Tr. at 56.) The assailant fired "numerous shots" until Turner heard a "clicking" noise, indicating to Turner that the weapon was empty. (Tr. at 56.) Turner related, "he just kept pulling the trigger like he wanted to keep shooting me more." (Tr. at 56.) Turner did not remember seeing Lucas during the shooting, but he later observed Lucas lying on the ground.
 {¶ 13} As the shooting began, Wright jumped into the vehicle driven by Rife, and Rife began to drive away; Wright observed the shooting incident out of the back window. Rife drove out of the parking lot of the Doll House onto Karl Road, and then turned onto a service road. At the parking lot of a restaurant, Rife began to turn the vehicle around to go back to the scene, but Wright then observed appellant running through the parking lot of the restaurant, so Rife followed appellant while Wright called the police on his cell phone. Rife and Wright eventually flagged down a police cruiser and informed the officer of the direction appellant was running.
 {¶ 14} Columbus Police Officer Mark Reader responded to a dispatch indicating that shots had been fired at the Doll House, and that a suspect was running from the scene. Officer Reader exited his vehicle approximately three blocks from the Doll House, and noticed appellant crouching down near a pine tree. The officer then drew his weapon and arrested appellant. The officer found a small automatic handgun, containing a clip, in the area where appellant had been crouching down.
 {¶ 15} Lucas and Turner were transported to Riverside Methodist Hospital, where Turner was treated for gunshot wounds; Lucas, however, was pronounced dead in the emergency room. At trial, the parties jointly stipulated that it was the expert opinion of Dr. Patrick Fardal that Lucas died as a result of a single gunshot wound.
 {¶ 16} Mark Hardy, a criminalist with the Columbus Division of Police, examined the semi-automatic firearm found near where appellant was arrested. Hardy testified that nine spent shell casings collected at the scene of the shooting were all fired from the weapon in question.
 {¶ 17} Appellant testified on his own behalf. Appellant's brother, Timmy Hall, operates a tow truck business and a tattoo parlor, and appellant worked for his brother at the tattoo parlor. On the evening of February 7, 2003, following work, appellant went to the Dockside Dolls with his cousin, "Georgie." (Tr. at 448.) Appellant later went to the Doll House because his brother had previously asked him to meet him there for a drink. After arriving, appellant sat down with his brother, as well as Tantarelli and Mark Jones. Jones and Timmy Hall were partners in the tow truck business.
 {¶ 18} A short time later, appellant left the club and went back to the Dockside Dolls. Appellant subsequently received a call from his brother, so he returned to the Doll House to pick him up. Appellant then drove his brother to the tow truck shop to get the keys to a truck; Timmy Hall was using appellant's cell phone as they were driving to the shop. Upon arriving at the tow truck shop, they could not find keys to the vehicle, so they decided to go back to the Doll House to see if the truck keys were in Jones' car. On their way back, appellant's cell phone rang, and his brother answered; appellant learned that Tantarelli needed medical attention and had to go to the hospital.
 {¶ 19} They returned to the Doll House and appellant parked the vehicle in the parking lot of a shopping center located adjacent to the club. Appellant followed his brother toward the door of the club where a group of individuals were congregated. According to appellant, "[s]omebody yelled out, `that must be Joe's boy.'" (Tr. at 459.) Appellant's brother turned around and said, "you don't know me." (Tr. at 459.) The other man, who appellant later learned was Ricky Turner, said, "I don't need to know you, mother fucker." (Tr. at 459.)
 {¶ 20} Ricky Turner and Timmy Hall then began arguing. At trial, appellant acknowledged he was carrying a weapon loaded with nine rounds of ammunition that evening. During the argument, Turner was moving backwards, and appellant thought they were getting ready to fight. Turner then said to appellant's brother, "I got something for you. I got my strap." (Tr. at 463.) Appellant took that statement to mean that Turner had a weapon. Appellant's brother responded, "I don't give a fuck if you got a gun. I'm not afraid to die." (Tr. at 463.)
 {¶ 21} Turner then walked around the corner, and appellant tried to calm down his brother. Appellant testified that he wanted to try to "smooth things out" with Turner, so he jogged around the corner of the building toward Turner. (Tr. at 463.) According to appellant, Turner was "leaning in his car," and as he was "coming out of his car" he had a gun in his right hand. (Tr. at 465.) Appellant pulled his gun "because at that point there was nowhere to run." (Tr. at 465.) Appellant testified that Turner started to raise his gun, so "I proceeded to shoot at him." (Tr. at 466.) Appellant fired all the rounds of ammunition he had. Appellant denied seeing Tommy Lucas at the time.
 {¶ 22} After firing the weapon, appellant began to run toward an apartment complex. An officer subsequently arrested appellant near the complex. Appellant told the officer he shot Turner "[b]ecause he wanted to try to kill me." (Tr. at 469.)
 {¶ 23} On cross-examination, appellant stated that he was unaware of any altercation when he learned Tantarelli needed medical attention; rather, he assumed Tantarelli might be having heart problems. Appellant denied that his brother was standing at the entrance to the Doll House with his hands in his pocket when Turner and his friends exited the club. Appellant acknowledged that he could have left the area at the time Turner indicated he was going to get a weapon. When asked why he did not leave, appellant responded, "[w]hy not try to just talk things out?" (Tr. at 499.) Appellant stated that Turner did not fire at him because "[h]e didn't have a chance." (Tr. at 506.)
 {¶ 24} Joseph Epling testified on behalf of appellant. On February 7, 2003, Epling was at the Doll House with Tantarelli and Browning, and later that evening Ricky Turner and his friends arrived. Epling was acquainted with Turner's group, including Rife, who Epling had a prior disagreement with. According to Epling, Turner and some others approached Tantarelli, acting "real riled up." (Tr. at 370.) Epling went outside with Turner, and he told Turner that Tantarelli "was drunk, you know, just to let it go." (Tr. at 370.) Turner responded, "Don't let me catch another felony up here. Don't make me go get my gun." (Tr. at 370.)
 {¶ 25} Turner and his friends eventually went back inside the club. Approximately five minutes later, Turner and his friends come back outside, and Jimmy Turner told Epling, "I just knocked your boy out." (Tr. at 371.) Epling responded, "you shouldn't have done that." (Tr. at 372.) Epling then went back inside the club, and a short time later he heard someone report that shots had been fired in the parking lot.
 {¶ 26} Epling went outside and saw an ambulance in the parking lot. He later saw Jimmy Turner walk over and pick up "a coat or something that was left behind." (Tr. at 376.) Turner had the coat for a few minutes and then a police officer "walked up to him, said something to him and he drops it. Then I seen him walk off this way." (Tr. at 376.)
 {¶ 27} Epling testified that, several months after the incident, he had a conversation with Ricky Turner regarding the events that evening and Turner related he "had told Tommy and Timmy that he was going to the car to get his gun." (Tr. at 379.) Turner told Epling that he did not actually have a weapon that evening.
 {¶ 28} Mark Jones was also called as a witness by the defense. On the evening of February 7, 2003, Jones had gone to a car show with Tantarelli, and they later drove to the Doll House. Appellant and his brother were also at the club, but they left after approximately five minutes. Later, when Ricky Turner and his friends arrived at the club, Jones thought there might be trouble, so he placed a call to Timmy Hall. Jones observed Epling and some others go outside, but when Epling later walked back into the club, Jones placed another call to Hall to tell him "everything was fine." (Tr. at 398.)
 {¶ 29} A short time later, Jimmy Turner punched Tantarelli in the face. Fuller came over to Tantarelli, "pulled his arm up and said, `[t]old you, don't fuck with us west side boys.'" (Tr. at 400.) Turner and his group were then told to leave the club.
 {¶ 30} Tantarelli was bleeding, so Jones helped him to the bathroom area. Jones was then informed that two individuals had been shot in the parking lot. Jones walked outside and observed Ricky Turner and Tommy Lucas lying on the ground. Jimmy Turner was standing near his brother, screaming, "[i]t's on now. You shot my brother. It's on now." (Tr. at 403.)
 {¶ 31} According to Jones, "there was an officer trying to calm him down and then his brother had a pile of clothes there. He [Jimmy Turner] picked them up and walked towards his vehicle with them." (Tr. at 403.) Turner was carrying a coat, and an officer told him to put it down, but Turner responded, "Fuck you. This is my brother's stuff. I can take it if I want." (Tr. at 404.) Jones testified that Turner walked to his car, put the clothing in the car and then left the scene. On cross-examination, Jones acknowledged that he had previously told an investigator that he was unsure whether Jimmy Turner put the clothes down or took them with him.
 {¶ 32} Following deliberations, the jury returned verdicts finding appellant guilty of the lesser-included offenses of murder and attempted murder. The jury also found appellant guilty of the firearm specifications. By judgment entry filed on December 8, 2003, the trial court sentenced appellant to 15 years to life as to count one (murder), with an additional three years for the firearm specification, and seven years incarceration as to count two (attempted murder), with count two to run consecutive with count one.
 {¶ 33} On appeal, appellant sets forth the following four assignments of error for review:
First Assignment of Error: The evidence was legally insufficient to support appellant's conviction, insofar as a reasonable trier of fact could only conclude appellant had proven the affirmative defense of self-defense by a preponderance of the evidence.
Second Assignment of Error: The court erroneously overruled appellant's motion for acquittal pursuant to Criminal Rule 29 as the state failed to prove the element of prior calculation and design.
Third Assignment of Error: Appellant's convictions were against the manifest weight of the evidence.
Fourth Assignment of Error: The trial court erroneously imposed consecutive sentences.
 {¶ 34} Appellant's first, second and third assignments of error are somewhat interrelated and will be considered together. Under his first assignment of error, appellant argues the evidence was legally insufficient to support his convictions, based upon his contention that he proved the affirmative defense of self-defense. Under his second assignment of error, appellant contends that the court erred in overruling his motion for acquittal pursuant to Crim.R. 29 because, it is asserted, the state failed to prove the element of prior calculation and design. In his third assignment of error, appellant contends that his convictions were against the manifest weight of the evidence.
 {¶ 35} Sufficiency of the evidence and weight of the evidence are distinct legal concepts, and in State v. Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617, at ¶ 30-31, this court discussed those distinctions as follows:
To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proven beyond a reasonable doubt. * * * Sufficiency is a test of adequacy, a question of law. * * * We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. * * * We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. * * * A conviction based upon legally insufficient evidence amounts to a denial of due process * * * and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant. * * *
A manifest weight argument, by contrast, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. * * * Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. * * * Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * *
 {¶ 36} As indicated above, although charged with aggravated murder and attempted aggravated murder, appellant was convicted of the lesser-included offenses of murder and attempted murder. R.C. 2903.02(A) defines the offense of murder as "purposely caus[ing] the death of another." A defendant commits attempted murder by "purposely engaging in conduct that, if successful, would constitute or result in the purposeful death of another person." State v. Bostick, Cuyahoga App. No. 82933, 2004-Ohio-1676, at ¶ 7.
 {¶ 37} At trial, appellant did not dispute that he fired the shots that killed Lucas and wounded Turner; however, appellant's theory was that he acted in self-defense. Under Ohio law, self-defense is an affirmative defense that the accused must prove by a preponderance of the evidence. State v. Smith, Franklin App. No. 04AP-189, 2004-Ohio-6608, at ¶ 16. In order to establish self-defense, the following elements must be established: (1) the defendant was not at fault in creating the situation giving rise to the dispute; (2) the defendant had an honest belief that he was in imminent danger of death or great bodily harm and that the only means of escape from such danger was the use of force; and (3) the defendant did not violate any duty to retreat or avoid the danger. Id.
 {¶ 38} The record in this case indicates that the trier of fact was faced with two competing versions of the events. As noted, appellant testified that he pursued Turner around the corner so that he could smooth things over with him, but that Turner pulled out a handgun and pointed it toward him.
 {¶ 39} The prosecution, however, presented witnesses that contradicted appellant's version. Specifically, according to the state's witnesses, Ricky Turner and appellant's brother exchanged angry words, but appellant did not participate in the argument. Rather, there was testimony that, when the argument between Turner and appellant's brother began, appellant slipped away for a brief period of time. Turner, believing the argument was over, walked away. Appellant, however, armed with a handgun, came running up to his brother (from a direction outside the parking lot), bumped into his brother, and then chased after Turner and began firing at him. The first shot struck Turner in the buttocks, and after he fell from that shot, his assailant stood over him and emptied the chamber of the handgun until it clicked. Turner also received a gunshot wound in his right lateral abdomen area, while Tommy Lucas died as a result of one of the shots fired by appellant in the parking lot. After the shooting, appellant fled the scene.
 {¶ 40} The thrust of appellant's self-defense argument is essentially that his version of the events was more believable than the state's witnesses. However, while appellant testified that Turner had a weapon and was the aggressor, the jury was not required to believe appellant's version, which contrasted with the testimony of other witnesses. The location of one of the wounds to Turner, i.e., the gunshot wound to the victim's buttocks, is consistent with the state's theory that Turner was running away from appellant at the time he began firing. During his testimony, appellant acknowledged that he fired all nine shots chambered in the handgun during the incident. The firing of multiple shots undercuts a claim of self-defense. State v. Brown, Franklin App. No. 03AP-858, 2004-Ohio-5064, at ¶ 31. Appellant also acknowledged at trial that he did not have to pursue Turner in the parking lot, but, rather, he could have left the scene and retreated safely. Instead of retreating, however, appellant testified that he wanted to talk things over with Turner. Although the defense attempted to raise questions about whether Turner had a weapon that evening, none of the state's witnesses placed a weapon in Turner's possession, nor was a weapon found at the shooting scene, and appellant testified that Turner did not fire any shots at him during the incident.
 {¶ 41} Here, the jury weighed the credibility of the testimony presented and obviously found the state's witnesses more credible, and such a credibility determination was within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Based upon the evidence presented, the jury could have reasonably determined that appellant could have avoided any danger by retreating and not pursuing Turner as Turner was walking away from appellant and his brother, and that appellant did not believe he was in imminent danger of death or great bodily harm at the time he fired at Turner. Thus, a rational trier of fact could have found that the elements of self-defense had not been established by a preponderance of the evidence. Rather, there was substantial, credible evidence to support the convictions, and we cannot conclude that such convictions were against the manifest weight of the evidence.
 {¶ 42} Appellant also maintains that a manifest miscarriage of justice occurred at trial because the court granted two motions in limine requested by the state, precluding defense counsel from questioning Ricky Turner about his possession of weapons on other occasions, and barring the defense from introducing evidence that Turner's group had to pay a bouncer $200 to gain admission to the Doll House on the date of the incident because of a prior altercation at the nightclub.
 {¶ 43} By way of background, on the morning of trial, just prior to opening statements and outside the presence of the jury, the court entertained two oral motions in limine by the prosecution. The state first requested the court to prohibit defense counsel from asking Turner if he had weapons on prior occasions, arguing that such evidence was irrelevant to this case in the absence of evidence that appellant knew the victim at the time of the incident. In response, defense counsel argued that evidence showing Turner possessed weapons on prior occasions "goes to the factual circumstances of whether it's more likely or not that there is a firearm there that Ricky Turner had." (Tr. at 4.) The trial court informed the parties, "at this point in time I'm not going to allow it. If at the point in time you are going to ask it, approach the bench." (Tr. at 4.)
 {¶ 44} The state also requested that the court not allow the defense to discuss during opening statement the fact that the shooting victim and his friends had been involved in a prior altercation at the Doll House. Again, the court informed the parties, "at this point in time, I'm not going to permit that. But again, at the present time, make sure if you want to ask a question dealing with that you approach the bench." (Tr. at 6.)
 {¶ 45} Under Ohio law, a trial court's ruling on a motion in limine "reflects the court's anticipated treatment of an evidentiary issue at trial, and as such it is a tentative, interlocutory, and precautionary ruling." State v. Clowers (1999), 134 Ohio App.3d 450, 454. Thus, "[i]n deciding such motions, the trial court is at liberty to change its ruling on the disputed evidence in the actual context of the trial." Id. Further, finality does not attach when the motion is granted; instead, it is incumbent upon the party who has been temporarily restricted from introducing evidence by virtue of the court's ruling in limine to seek the introduction of such evidence by proffer or otherwise "in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal." Id.
 {¶ 46} In the present case, appellant never sought to admit the disputed evidence at trial, and, thus, failed to preserve the issue of its admissibility. Clowers, supra. Nor do we find that the trial court's ruling on the motions resulted in plain error.
 {¶ 47} Regarding defense counsel's desire to introduce evidence that Turner may have carried weapons on prior occasions, evidence regarding an individual's character is generally inadmissible for the purpose of showing that the defendant acted in conformity therewith on a particular occasion. State v. Mason, Lucas App. No. L-02-1189, 2003-Ohio-5974, at ¶ 36. One exception to this general rule is that a defendant may, in certain circumstances, offer testimony regarding prior violent acts of the victim of which the defendant is aware when arguing self-defense.State v. Young (Aug. 31, 1994), Lorain App. No. 93CA005710. However, because the victim's character "is not an essential element of self-defense, testimony regarding specific instances of the victim's violent conduct of which the defendant is unaware is properly excluded pursuant to Civ.R. 405(B)." Id.
 {¶ 48} In the present case, we agree with the state that the critical issue before the jury, for purposes of appellant's self-defense claim, was appellant's state of mind at the time he fired the shots in the parking lot, not the character of the victim. Mason, supra, at ¶ 37 ("The crucial element of self-defense is the `state of mind' of the defendant, not the character of the victim"). Here, there was no evidence that appellant was aware of any prior bad acts by Turner; rather, the only evidence was that they had never met before that evening. Thus, even had appellant pursued introducing evidence as to specific prior acts of Turner, such evidence was not relevant as to appellant's state of mind. Similarly, appellant has failed to show how evidence as to a prior altercation by Turner's group was relevant.
 {¶ 49} Appellant also contends that the trial court committed plain error in instructing the jury on the elements of prior calculation and design. However, even assuming that it was error for the court to submit such an instruction, appellant has not shown prejudice as he was found guilty of murder, not aggravated murder.
 {¶ 50} Despite the fact appellant was found guilty of the lesser-included offense, appellant suggests that the jury was influenced by the instruction. We find no merit to this argument. A motion by a defendant under Crim.R. 29 challenges the sufficiency of the state's evidence and, in considering such a motion, the evidence is construed in a light most favorable to the prosecution. State v. Chappell (Feb. 19, 1998), Cuyahoga App. No. 72227. The Ohio Supreme Court has held that it is "not possible to formulate a brightline test that emphatically distinguishes between the presence or absence of `prior calculation and design,'" but, instead, that "each case turns on the particular facts and evidence presented at trial." State v. Taylor (1997), 78 Ohio St.3d 15, 20. The Ohio Supreme Court has upheld findings of prior calculation and design in some "short-lived emotional situations." Id. at 19.
 {¶ 51} In the instant case, construing the evidence most strongly in favor of the state, the facts showed that appellant slipped away during the argument between Turner and appellant's brother, that he came running back from outside the parking lot area armed with a .9mm handgun, approached Turner from behind, and began immediately firing nine shots at him, including some shots fired at close range while standing over the victim as he was lying on the ground. Here, even though the jury found appellant guilty of the lesser-included offense of murder, there existed sufficient evidence to submit to the jury the issue of prior calculation and design. Finding no prejudice, appellant's argument that the trial court erred in its instruction is not well-taken.
 {¶ 52} Based upon the foregoing, appellant's first, second and third assignments of error are without merit and are overruled.
 {¶ 53} Under his fourth assignment of error, appellant asserts the trial court erred in imposing consecutive sentences. Specifically, appellant challenges the court's imposition of consecutive sentences as to count two, the attempted murder of Ricky Turner.
 {¶ 54} R.C. 2929.14(E)(4) provides as follows:
If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18
of the Revised Code, or was under postrelease control for a prior offense.
(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
 {¶ 55} Further, pursuant to R.C. 2929.14(E)(4) and 2929.19(B)(2)(c), "when imposing consecutive sentences, a trial court is required to make the statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing." State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165, at ¶ 20.
 {¶ 56} In the present case, at the sentencing hearing, the trial court made the following statements in addressing appellant:
With respect to Count Two, there is going to be a sentence of seven years in the state penitentiary. And that seven years is going to run consecutively with the sentence in Count One.
I can tell you that you did not get the maximum sentence on Count Two just because I believe the victim in this case helped to facilitate this offense. But you also did not get [the] minimum sentence, not only based upon the nature of this offense but this — the way the jury found it and the way I saw it, there was no self-defense. You were not backed up against the wall. You stalked Ricky Turner. And why Mr. Lucas got shot, I don't think anybody knows except you.
* * *
For purposes of the record, the Court did not give the minimum term because that will demean the seriousness of his conduct and not adequately protect the public from future crime. This is a case in which the defendant, as I said, stalked one individual and probably based upon what the jury found, he purposely caused the death of another and that person was not in any way causing this defendant any problems or helping to facilitate the offense. It was a senseless murder. And the conduct that he did with respect to Mr. Turner created serious physical harm upon him. And he does have a prior carrying concealed weapons offense as a juvenile.
The Court believes the shortest prison term would demean the seriousness of his conduct and not adequately protect the public from future crime.
I did give him consecutive sentences for reasons already stated. In addition, they are necessary to protect the public from future crime and are necessary to punish the offender and are not disproportionate with the seriousness of his conduct and the danger he poses to the public. And that the defendant committed multiple offenses and such multiple offenses are so great, no single prison term would adequately reflect the seriousness of this offense.
(Tr. at 661-664.)
 {¶ 57} The court also noted on the record that appellant had "a criminal record of several offenses; one being carrying concealed weapon." (Tr. at 659.)
 {¶ 58} In the present case, the trial court considered the facts and circumstances surrounding the death of Lucas and the injuries to Turner, the seriousness of the conduct, the impact on the victims, as well as appellant's prior criminal record. Based upon this court's review of the record, we find that the trial court made the necessary statutory findings and stated its reasons on the record for imposing the sentence. Accordingly, we find that the trial court did not err in imposing consecutive sentences.
 {¶ 59} Appellant's fourth assignment of error is overruled.
 {¶ 60} Based upon the foregoing, appellant's four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Lazarus and Sadler, JJ., concur.