DECISION AND JUDGMENT ENTRY
{¶ 1} Matthew J. Love appeals the conviction and sentence entered against him by the Ross County Court of Common Pleas for murder with a firearm specification and having a weapon under disability. Love contends that the trial court violated his right to due process and committed plain error when it allowed the state to introduce evidence that he invoked his constitutional right to silence, and that we should exercise our discretion under Crim.R. 52(B) to correct that error. Because we cannot say that the error clearly affected the outcome of the trial or seriously affected the fairness, integrity or public reputation of judicial proceedings, we disagree. Next, Love contends that his trial counsel was ineffective in failing to: (1) object to the introduction of evidence that he invoked his constitutional right to remain silent; (2) object to certain evidence that he claims directly refuted his claim of self defense; and (3) failing to try the weapon under disability charge to the court, instead of trying it to the jury. Because we find that Love has not established that, but for his trial counsel's individual or cumulative errors, there was a reasonable probability that the result of the proceeding would have been different, we disagree. Accordingly, we overrule each of Love's assignments of error and affirm the trial court's judgment.
 I. {¶ 2} On April 30, 2004, the Ross County Grand Jury indicted Love on one count of murder in violation of R.C. 2903.02 with both gun and repeat violent offender specifications, and one count of having a weapon under a disability in violation of R.C.2923.13, a felony of the third degree.[1] The indictment resulted from an incident on April 25, 2004 at the Misty Harbor Campground in Ross County, in which David A. Pickell was killed.
 {¶ 3} David Driggs, testified that, at the time of the Pickell's death, Driggs had resided at the campground in his trailer with his girlfriend, Cindy Curtis, for two to three weeks. Love resided in a trailer across the road from Driggs' trailer. Pickell lived in a trailer up the road.
 {¶ 4} Driggs testified that Pickell stopped by his trailer and asked Curtis to drive him to the store to get cigarettes. Curtis agreed, and they left in Curtis' car. While Curtis and Pickell were gone, Love stopped by looking for Pickell. Love told Driggs that Pickell picked up a chain from Love's yard the previous day. Love wanted that chain back, and indicated that he needed it to secure the door of his trailer. Love asked Driggs to tell Pickell that he wanted his chain back.
 {¶ 5} Curtis and Pickell eventually returned to the campground. Curtis dropped Pickell off at the top of the road, near his trailer, and returned to Driggs' trailer. Pickell walked down to Driggs' trailer five or ten minutes later and sat in the yard drinking beer and talking. Driggs testified that approximately twenty minutes later, Love came over and told Pickell that he wanted his chain because he needed to lock his trailer as he was going to the Veteran's Hospital. Pickell responded that he would walk back up to his trailer to get it in awhile. Love turned around and walked back to his own trailer.
 {¶ 6} Driggs stated that approximately twenty minutes later, he was still talking with Pickell and Curtis in front of his trailer when he heard Love's Jeep start. Love spun his tires and drove really fast toward Driggs' trailer. He stopped, got out of the Jeep, walked over to Pickell and said, "I want that chain, and I want it now." Driggs stated that Pickell told Love that since he brought the Jeep, Love could run him up to his trailer to get the chain. Love started walking toward his Jeep, saying something about wanting that chain, not some other chain. Pickell said, "You gonna pull something out on me?" Pickell then stood up and started walking slowly toward the Jeep. Love and Pickell exchanged words. Love kept talking about the chain, and Pickell said, "Fuck you and that chain." Love reached in to get something out of the Jeep, and Pickell was right behind him. Pickell asked if Love was going to pull a gun. Driggs could not initially see what Love was getting from the Jeep, but then heard Curtis scream he was getting a gun.
 {¶ 7} Driggs indicated that Pickell was only two or three feet away from Love when Love turned around with the gun pointed in the air. Driggs saw Pickell grab at Love's wrist or arm. He then saw Love jerk backwards and start walking backwards with the gun still in his hand. When Love was about six feet away from Pickell, Pickell put his hands up. Pickell was far enough away from Love that he could not have reached the gun with his hands. Then, Love pointed the gun at Pickell and shot him in the chest. When the first shot hit him, Pickell wobbled a little bit but remained standing. Three to four seconds later, Love pulled the trigger again even though Pickell had not made a move toward Love. The second shot hit Pickell, turned him around, and he fell backward to the ground. Love walked up to Pickell, stood over him, and pointed the gun at Pickell's head. Love then started walking back toward his trailer saying that it was self defense.
 {¶ 8} Driggs told Curtis to call 911 and checked Pickell's pulse. A deputy sheriff arrived after approximately ten to fifteen minutes. At trial, Driggs identified Love's gun as depicted in a photograph introduced as state's exhibit 7.
 {¶ 9} Upon cross-examination, Love's counsel questioned Driggs about a statement he allegedly gave to Detective Pierce on the day of the incident, wherein counsel claimed that Driggs told the Detective that Pickell grabbed Love by the wrist and held on as Love maneuvered and made a complete circle around Pickell. However, Driggs denied making such a statement and indicated that when Pickell grabbed Love's wrist, Love jerked away, started backing up, and then made the circle around Pickell.
 {¶ 10} Cynthia Curtis, the next witness for the state, essentially corroborated Driggs' testimony. Curtis testified that Love's legs were shaking real bad while he argued with Pickell. She also stated that while Love held the gun and backed away, Pickell, with his hands up, moved toward Love just before Love shot him. She indicated that before Love fired the shots, the two men did not push, hit or fight with each other, and she did not hear Pickell make any threats to Love.
 {¶ 11} Jim Perry, another campground resident, testified that he lived next to Love. He knew Love and visited Love in Love's trailer the morning of Pickell's death. He and Love went to town where they each purchased four twenty-four ounce beers. Then they returned to Love's trailer to drink and watch TV. While Perry was with Love, Love mentioned Pickell and the chain several times, and claimed he was going to "kick Pickell's ass." Perry also testified that, before he left Love's trailer on the day of Pickell's death, he saw a pistol under Love's mattress, where Love always kept it. He identified state's exhibit three, as the pistol he saw at Love's trailer.
 {¶ 12} Perry left Love's trailer about one fifteen or one thirty. He stopped by Driggs and Curtis' trailer for ten or fifteen minutes, and then went home to take a nap. When he awoke, he got up and went to the sink to wash his face. He then heard two pops that sounded like gunshots. He opened his trailer door to see what was going on. He saw Love standing outside Love's trailer and walked over to see what was happening. Perry testified that Love told him, "I just shot Pickell." Perry then told Love, "You fucked up," and Love responded, "[Y]eah, I fucked up." Perry asked Love where the gun was, and Love pointed to the woodpile where he apparently attempted to conceal the weapon. Later, when Perry visited Love in jail, Love told him that he did not want to shoot in the direction of Perry's trailer because he did not want to hit Perry.
 {¶ 13} Sergeant Stanley Addy, of the Ross County Sheriff's Department testified that he was the first law enforcement officer to arrive at the scene of the shooting. He walked over to Pickell, who was lying motionless on the ground, and bent down to check for a pulse. He did not find a pulse, but observed a gunshot wound to Pickell's chest. He spoke with Driggs, who was standing next to the body. He asked Driggs what happened, and Driggs replied that Love shot Pickell. Sgt. Addy asked where Love was at that time, and Driggs pointed east to Love's lot, approximately one hundred yards away. Sgt. Addy saw two men standing there, one in a green shirt, and one in a blue shirt. He asked Driggs which man was Love, and Driggs informed him that Love was wearing a green shirt.
 {¶ 14} Sgt. Addy drew his service weapon, approached the men on foot, and ordered them to put their hands up. The man in the blue shirt, who Det. Addy later identified as Perry, complied, and the man in the green shirt, who Det. Addy later verified was Love, just looked at him. He repeated his order for Love to put his hands up, and he did. Sgt. Addy then told the men to lie face down on the ground. Perry went down immediately, and after Sgt. Addy repeated the order a couple of times, Love went down on the ground.
 {¶ 15} As Sgt. Addy placed the cuffs on him, Love said that he told Pickell not to come any closer, and that he feared for his safety. Sgt. Addy testified that he advised Love of his Miranda rights and that Love said he wanted a lawyer. Deputy Young arrived on the scene as Sgt. Addy was cuffing Love, and Sgt. Addy asked him to pat down Love. When they did not find any weapons on Love's person, Sgt. Addy asked Love where the gun was, and Love told him it was behind the woodpile. Dep. Young then took Love to the back of his patrol car and Sgt. Addy walked behind the woodpile, where he found a black revolver on a pile of wood. Sgt. Addy identified state's exhibit three as the weapon he found on the woodpile. Defense counsel did not cross-examine Sgt. Addy.
 {¶ 16} Detective David Bower of the Ross County Sheriff's Department testified that he searched Love's trailer and vehicles. He stated that he discovered a holster and a green duffle bag in Love's Jeep. In the green duffle bag, he found lead ball ammunition and a pair of black, military style leather gloves. He also testified that when he went to the Ross County Jail to perform a gunshot residue collection on Love, Love told him that he held the gun in his right hand.
 {¶ 17} Next, Dr. Lee Lehman, a forensic pathologist and the Chief Deputy Coroner in Montgomery County, Ohio, testified regarding the autopsy he performed on Pickell. Dr. Lehman indicated that upon his initial visual inspection of Pickell's body, he observed three individual gunshot wounds, one which passed through Pickell's left arm, and one which appeared to be a re-entrance wound. He explained that one bullet entered the left side of Pickell's chest, penetrated his aorta, went through his right lung, and exited his back by his right scapula. Dr. Lehman indicated that the wound to the aorta would not have had much of an immediate effect on Pickell, other than causing pain. He stated that it would not have knocked Pickell down immediately, and that Pickell would have had fifteen to thirty seconds of consciousness before he would have collapsed.
 {¶ 18} The other bullet entered under Pickell's left breast, went through his chest wall, diaphragm, liver, stomach, adrenal glands, and stopped in his spine, next to his spinal cord. Dr. Lehman also indicated that the wound to Pickell's arm lined up very well with the wound under the left breast, and that, based upon the orientation of the wounds, Pickell's elbows had to be at his side at the time he was shot. Dr. Lehman further indicated that the wound next to his spinal cord should have caused lower extremity paralysis, which would have caused Pickell to fall. Dr. Lehman also testified that Pickell would not have had the ability to walk or fight after either of the wounds.
 {¶ 19} Dr. Lehman testified that Pickell basically bled to death from his gunshot wounds. He indicated that both of Pickell's chest wounds were fatal without medical treatment, and that he did not think Pickell could have survived the wound to his aorta even with medical treatment.
 {¶ 20} Deputy Donald Walker of the Highland County Sheriff's Department was the state's next witness. He testified that Love had previously been convicted of felonious assault in Highland County and that, as a result of that conviction, Love was placed on probation.
 {¶ 21} Finally, William Mark, a firearms examiner with the Bureau of Criminal Investigation testified that the gun recovered by the Ross County Sheriff's Deparment was functional. He also indicated that, based upon a comparison with a bullet he fired from the weapon, the bullet recovered during Pickell's autopsy was consistent with being fired from that weapon.
 {¶ 22} The defense did not call any witnesses, and both the state and the defense rested following the admission of the state's exhibits. The trial court instructed the jury, and included an instruction on the lesser included offense of involuntary manslaughter. The jury returned guilty verdicts on both the murder and the weapon under disability charges, as well as the firearm specification.
 {¶ 23} The trial court sentenced Love to fifteen years to life in prison for the murder charge, three years in prison for the gun specification, and three years in prison for the charge for having a weapon under disability. Love timely appeals, raising the following assignments of error: "[I.] DEFENDANT'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE PROSECUTION SUBMITTED EVIDENCE OF THE DEFENDANT'S INVOCATION OF HIS RIGHT TO SILENCE. THIS VIOLATED DEFENDANT'S RIGHTS AS GUARANTEED BY THE FIFTH,SIXTH AND FOURTEENTH AMENDMENTS UNDER THE UNITED STATES CONSTITUTION AND ARTICLE 1, §§ 10 AND 16 OF THE OHIO CONSITUTION. [II.] APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE STATE AND FEDERAL CONSTITUTIONS."
 II. {¶ 24} In his first assignment of error, Love contends that the state violated his constitutional right to due process by eliciting testimony regarding his invocation of his right to remain silent. Specifically, Love contends that the state improperly elicited testimony that, after Sgt. Addy advised Love of his Miranda rights, Love said he wanted a lawyer.
 {¶ 25} Love concedes that he failed to object to the alleged error at trial, and that, by failing to object, he has forfeited all but plain error. Pursuant to Crim.R. 52(B), we may notice plain errors or defects affecting substantial rights, although they were not brought to the attention of the court. The Ohio Supreme Court has found that "[b]y its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial." State v. Barnes (2002), 94 Ohio St.3d 21, 27,2002-Ohio-68. First, an error must exist. Id., citing State v.Hill (2001), 92 Ohio St.3d 191, 200, citing United States v.Olano (1993), 507 U.S. 725, 732 (interpreting Crim.R. 52[B]'s identical federal counterpart, Fed.R.Crim.P. 52[b]). Second, the error must be plain, obvious, or clear. Id. (Citations omitted.) Third, the error must affect "substantial rights," which the court has interpreted to mean "but for the error, the outcome of the trial clearly would have been otherwise." Id. citing Hill
at 205; State v. Moreland (1990), 50 Ohio St.3d 58, 62; Statev. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus.
 {¶ 26} Even if a reviewing court finds that a forfeited error satisfies all three prongs of the test, it is not required to notice the error, but retains discretion to decide whether it should correct the error. A reviewing court should use its discretion under Crim.R. 52(B) to notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Barnes, supra, citing Long at paragraph three of the syllabus, and Olano,507 U.S. at 736 (suggesting that appellate courts correct a plain error "if the error `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings,'" quoting UnitedStates v. Atkinson [1936], 297 U.S. 157, 160).
 {¶ 27} The Ohio Supreme Court has acknowledged that "since the adoption of Crim.R. 52(B), this court has followed federal precedents in directing the rule be invoked only in exceptional circumstances to avoid a miscarriage of justice." Long at 96. (Citation omitted.) The United States Supreme Court has stated, "we have never held that a Rule 52(b) remedy is only warranted in cases of actual innocence." Olano, 507 U.S. at 736. (Emphasis in original.) "An error may `seriously affect the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." Id. at 736-737.
 {¶ 28} In Doyle v. Ohio (1976), 426 U.S. 610, the United States Supreme Court held that: "[W]hile the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." Doyle at 618. There, the court's holding specifically prohibited the prosecution's use of an arrested person's silence to impeach an explanation he subsequently offered at trial. Id. In Wainwright v. Greenfield (1986),474 U.S. 284, the court expanded the application of its holding inDoyle, stating "What is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized." Wainwright at 295. Thus, under the holding inWainwright, the state may not use an accused's silence after receiving his Miranda warnings as evidence of his guilt during its case-in-chief.
 {¶ 29} In State v. Rogers (1987), 32 Ohio St.3d 70, the Ohio Supreme Court addressed the prosecution's use of the defendant's post arrest silence to attack the defendant's insanity defense throughout the trial. In reversing the trial court's conviction and remanding the cause for a new trial, the court noted that the prosecution's use of the defendant's exercise of his constitutional rights permeated all phases of the trial from the prosecution's case-in-chief to its closing argument. Id. at 73-74. The court recognized that some of the evidence regarding the defendant's obtaining legal counsel was probative of his sanity when he committed the acts in question. Id. at 74. However, the court held "we must nevertheless abide by the principle of law mandated upon us by the United States Supreme Court that an exercise of rights under the Constitution cannot be used as evidence against appellant where such exercise was in response to the Miranda rights being read to him." Id.
 {¶ 30} Here, unlike the situation in Rogers, supra, we have one brief mention of Love's request for an attorney at the time of his arrest. Sgt. Addy revealed the information during his testimony describing the events leading to Love's arrest. Sgt. Addy explained in detail what happened when he arrived on the scene, including his discovery of Pickell's body, Driggs' statement identifying Love as the shooter, and Love's hesitancy to get down on the ground upon his command.
 {¶ 31} The prosecutor then said: "All right. What happened then?" Sgt. Addy responded: "I approached the male in the green shirt and . . . I had pulled my cuffs out to go ahead and detain him. At this time he was identified as Matt Love. Mr. Love told, at this time he told me that he told him not to come any closer. He shot him. He was in fear for his safety. I went ahead and cuffed him. As I was cuffing him, Deputy Danny Young pulled in. I started advising Mr. Love of his Miranda Rights at this time he said he wanted a lawyer."
 {¶ 32} Under the holdings of Doyle and Wainwright, supra, the admission of Sgt. Addy's testimony that Love said he wanted a lawyer was clearly error. Thus satisfying the first two prongs of the Barnes analysis. Therefore we must proceed to the next step of the analysis to determine whether the error affected Love's substantial rights.
 {¶ 33} We note the prosecutor did not directly elicit the testimony regarding Love's request for a lawyer, but received it in response to a general question about what happened during the course of Love's arrest. Once Sgt. Addy revealed that Love requested an attorney, the prosecutor did not attempt to elicit further testimony on that issue or otherwise dwell upon that fact. Instead, he promptly moved on, stating, "Okay. All right. Now, so you're there, you got these two individuals there on the ground. Young appears. What do you tell Young to do?" No one mentioned Love's request for an attorney again during his trial.
 {¶ 34} Although the Ohio Supreme Court has found that "we cannot condone even an isolated reference to a defendant's post-arrest silence," the court has specifically declined to notice plain error where a prosecutor made a single remark regarding a defendant's post-arrest silence during closing argument. State v. Rahman (1986), 23 Ohio St.3d 146, 153. Moreover, the United States Supreme Court has recognized that not all constitutional errors are prejudicial. Chapman v.California (1967), 386 U.S. 18, 22, overruled on other grounds,Brecht v. Abrahamson (1993), 507 U.S. 619, 636-638 (holding that the "harmless error beyond a reasonable doubt" analysis is not applicable in habeas cases); State v. Williams (1983),6 Ohio St.3d 281, paragraph six of the syllabus. Rather the court has recognized that "* * * there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." Chapman at 22;Williams at 286. In order to deem a constitutional error nonprejudicial, a reviewing court must find that it is "harmless beyond a reasonable doubt." Chapman at 24; Williams at 286. An error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of the defendant's guilt. Williams at paragraph six of the syllabus.
 {¶ 35} Applying such an analysis, the Ohio Supreme Court has previously held that a single comment by a police officer regarding a suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error.State v. Treesh (2001), 90 Ohio St.3d 460, 480, citing Meeksv. Havener (C.A.6, 1976), 545 F.2d 9, 10.
 {¶ 36} Here, Love contends that the submission of Sgt. Addy's statement regarding his request for a lawyer was inherently prejudicial, because he asserts that a jury's natural inclination upon hearing that a defendant has sought the advice of counsel is to assume that he is guilty. Love's request for a lawyer and assertion of his right to remain silent may imply his guilt.
 {¶ 37} However, the other testimony properly admitted at trial, if believed by the jury, demonstrates that Love armed himself and set out to confront Pickell. Driggs and Curtis, two eyewitnesses, reported that, after exchanging words with Pickell, Love walked to his Jeep and pulled out the gun. Although Driggs and Curtis testified that Pickell attempted to grab at Love's wrist or arm while Love had the gun in his hand, they reported Love was able to either avoid Pickell's grasp or break free of it. Love then backed away from Pickell, and when Love was approximately six feet away and out of Pickell's reach, Pickell put his hands up. Love then pointed the gun at Pickell and shot him in the chest. Although Driggs and Curtis testified that Pickell did not make a move toward Love after the first shot, and Dr. Lehman testified that he would have been unable to do so, Love fired a second shot at Pickell's chest, which caused him to drop to the ground. Love then stood over Pickell, holding a gun to his head as he lie motionless on the ground, before he walked away.
 {¶ 38} In the absence of the pervasive references to the defendant's invocation of his constitutional right to silence found in Rogers, supra, and in light of the overwhelming evidence of Love's guilt, we cannot find that: (1) but for the solitary mention of Love's request for an attorney, in the context of the arresting officer's narrative of his arrest, the outcome of the trial clearly would have been different; or (2) the error seriously affected the fairness, integrity or public reputation of judicial proceedings. Instead, we conclude that the error is harmless beyond a reasonable doubt because the remaining evidence, standing alone, constitutes overwhelming proof of Love's guilt. Accordingly, we overrule Love's first assignment of error.
 III. {¶ 39} In his second assignment of error, Love contends that he did not receive effective assistance of counsel at trial. Specifically, Love asserts that his trial counsel was deficient because he failed to: (1) object to the Doyle error; (2) object to speculative evidence of the decedent's intent which directly refuted Love's self defense claim; (3) try the weapon under disability charge to the court.
 {¶ 40} In order to reverse a conviction or sentence based upon ineffective assistance of counsel a reviewing court must find: (a) deficient performance, "errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment," and (b) prejudice, "errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." State v. Ballew (1996), 76 Ohio St.3d 244, 255, citing Strickland v. Washington (1984), 466 U.S. 668, 687. If a court can resolve a claim of ineffective assistance of counsel under only one prong of this two-pronged test, then the court does not have to analyze both prongs. See, e.g., State v.Madrigal (2000), 87 Ohio St.3d 378, 389.
 {¶ 41} With regard to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."Strickland at 689. Furthermore, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. The United States Supreme Court has noted that "there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." United States v. Hasting (1983),461 U.S. 499, 508-509. Additionally, with regard to prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."Strickland, 466 U.S. at 694.
 {¶ 42} Here, Love first asserts that his trial counsel was ineffective because he failed to object to Sgt. Addy's testimony regarding Love's request for an attorney at the time of Love's arrest. While we found that the trial court's admission of that statement was erroneous in our analysis of Love's first assignment of error, we also found that: (1) that single reference to Love's request for an attorney did not constitute plain error; and (2) in light of the overwhelming evidence of Love's guilt, that error was harmless beyond a reasonable doubt. Therefore, Love cannot demonstrate that he suffered any prejudice as a result of his attorney's failure to object to Sgt. Addy's statement. Moreover, we note that, in light of the single, brief reference to Love's request for an attorney in the context of Sgt. Addy's narrative, it may have been sound trial strategy for Love's counsel to ignore the statement, rather than drawing additional attention to it by voicing an objection.
 {¶ 43} Next, Love contends that his trial counsel was ineffective because he failed to object to speculative evidence of Pickell's intent which directly refuted Love's claim of self defense. Specifically, Love contends that his trial counsel failed to object to Driggs' testimony that Pickell was not attempting to grab the gun, but was merely trying to grab Love's wrist before the shooting occurred. Love contends that Driggs' testimony constituted inadmissible speculation and that it destroyed his self defense argument.
 {¶ 44} In Ohio, the affirmative defense of self defense has three elements: (1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger. State v. Williford (1990), 49 Ohio St.3d 247, 249, citing State v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus. The defendant must prove these elements by a preponderance of the evidence in order to demonstrate that he acted in self defense. Williford at 249.
 {¶ 45} Our review of the transcript reveals that there was only one occasion where Driggs specifically stated, "No, he wasn't trying to grab the gun. He was trying to get a hold of his arm." All of the other references to the brief scuffle, including defense counsel's cross-examination of Driggs, refer to Pickell's attempts to grab Love's arm or wrist. In fact, when defense counsel cross-examined Driggs, he brought up a statement Driggs allegedly gave to Lt. Pierce on the day of the shooting, wherein counsel claimed that Driggs reported that Pickell did grab Love's arm, and held on while Love made a complete circle. On the stand, Driggs denied that it happened that way. He testified "But they must have wrote it down wrong because I was trying to explain to him when he retched (sic) up to try to grab a hold of the weapon, you know like he's going to try grab his wrist, [Love] just jerked back and started making a circle around [Pickell]." In our view, the jury could still have construed Pickell's reaching for Love's wrist or arm, while Love held the gun in his hand, as Pickell's attempt to gain control of the weapon. Accordingly, we fail to see how the distinction between Pickell's reaching for Love's wrist or arm versus reaching directly for the gun destroys Love's claim of self defense.
 {¶ 46} Even if the distinction between Pickell's reaching for Love's wrist or arm versus reaching directly for the gun did somehow diminish the viability of Love's claim of self defense, it was not the most significant problem with Love's defense. The state presented undisputed testimony that, if believed, established Love was at fault in creating the violent situation giving rise to Pickell's death. Witnesses testified that Love went looking for Pickell several times on the day of the shooting. The last time Love set out to confront Pickell, he brought a gun. After Love and Pickell exchanged words, Love first resorted to violence by pulling the gun out of his Jeep. Pickell tried to grab at Love's wrist or arm before Love broke free and backed approximately six feet away from Pickell. Even if Pickell's efforts to grab at Love's arm or wrist were actually attempts to gain control of Love's gun, in light of the undisputed testimony that Love was the aggressor, such efforts would not change the situation to one of self defense. See, e.g.,State v. Fluellen (Sept. 20, 1977), Franklin App. No. 77AP-332.
 {¶ 47} Moreover, Love failed to present any evidence that he did not violate the duty to retreat. Generally, "a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation." Williford at 250, citingRobbins at 79-81. Here, the state's witnesses testified that even after Pickell attempted to grab at Love's wrist, Love managed to break free and back away. Yet, when Love was out of Pickell's reach, approximately six feet away, and still holding the gun, Love did not attempt to retreat to the relative safety of his Jeep or his trailer. Instead, Love shot Pickell, not once, but twice in the chest. No reasonable jury could possibly believe that Love satisfied any duty to retreat. Furthermore, the firing of multiple shots also undercuts Love's claim of self defense.State v. Palmer (1997), 80 Ohio St.3d 543, 564. See, also,State v. Hall, Franklin App. No. 04AP-17, 2005-Ohio-335, at ¶40; State v. Brown, Franklin App. No. 03AP-858, 2004-Ohio-5064, at ¶ 31. Thus, even in the absence of counsel's failure to object to Drigg's testimony that Love was not trying to reach the gun, Love failed to prove by a preponderance of the evidence that he acted in self defense when he killed Pickell.
 {¶ 48} Finally, Love contends that he received ineffective assistance of counsel because his trial attorney failed to try the weapon under a disability charge to the court in order to prevent the jury from learning of his prior conviction. Pursuant to R.C. 2923.13(A)(2), the existence of Love's prior conviction was an essential element of the weapon under a disability charge. However, Love asserts that because he did not testify at trial, the evidence of his prior conviction for felonious assault would not have been admitted but for his counsel's decision to try both the murder and weapon under a disability charges to the jury. He claims that the admission of his prior conviction was prejudicial because of the risk that the jury convicted him based upon his propensity for violence, rather than the weight of the evidence.
 {¶ 49} Love now argues that there was no strategic reason for trying the weapon under disability charge to the jury. However, the state notes, inter alia, that the chance of an acquittal, or even a hung jury, is considerably greater when charges are tried to a jury, rather than a judge. We must accord deference to defense counsel's strategic choices made during trial and cannot second guess those strategic choices through hindsight.Strickland at 689. It would have been preferable for the jury not to learn of Love's previous conviction for felonious assault. However, in light of the evidence submitted by the state, as well as the corresponding lack of evidence that Love was not the aggressor and did not violate any duty to retreat, we cannot find that trial counsel's decision to try the weapon under a disability charge to the jury unduly prejudiced Love or denied him a fair trial.
 {¶ 50} In conclusion, we find that Love has not established a reasonable probability that, but for his trial counsel's individual or cumulative errors, the result of the proceeding would have been different. Even if none of the alleged errors occurred, the state submitted overwhelming evidence of Love's guilt in the form of strong eyewitness testimony regarding the shooting and the events leading up to support Love's conviction. Moreover, no evidence was presented that would allow a reasonable jury to conclude that Love was not the aggressor, or that Love satisfied any duty to retreat. Accordingly, we overrule Love's second assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.
If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. The stay as herein continued will terminate in any event at the expiration of the sixty day period.
The stay shall terminate earlier if the appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec.2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of said sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, J. and McFarland, J.: Concur in Judgment and Opinion.
[1] Although it is not at issue in this appeal, we note that the indictment erroneously identified count two as a fifth degree felony.