[Cite as *State v. Hankison*, 2010-Ohio-4617.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | Case No. 09CA3326 |
| v. | : | |
| | : | DECISION AND |
| Nelson E. Hankison, | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellant. | : | File-stamped date:  9-21-10 |

_____

APPEARANCES:

Timothy Young, Ohio State Public Defender, and Craig M. Jaquith, Ohio State Assistant Public Defender, Office of the Ohio Public Defender, Columbus, Ohio, for Appellant.

Mark E. Kuhn, Scioto County Prosecutor, and Pat Apel, Scioto County Assistant Prosecutor, Portsmouth, Ohio, for Appellee.

_____

Kline, J.:

**{¶1}**    Nelson E. Hankison (hereinafter "Hankison") appeals the judgment of the Scioto County Court of Common Pleas.  After a jury trial, Hankison was found guilty of aggravated murder and various other charges.  On appeal, Hankison contends that he received ineffective assistance of counsel.  Because the complained-of actions were part of a reasonable trial strategy, we disagree.  Furthermore, even if we were to find that Hankison's trial counsel erred, Hankison was not deprived of a fair trial because the result of his trial is reliable.  Accordingly, we affirm the judgment of the trial court.

I.

A. Introduction

**{¶2}** Claude "Sonny" Hamilton (hereinafter "Sonny") was murdered on March 29, 2009. He was married to Billie Hamilton (hereinafter "Billie") for twenty-four years. Sonny and Billie remained friends even though they were divorced, and Sonny spent most of his time at Billie's residence. Apparently, Sonny suffered from a variety of medical problems, and he wanted to be with Billie when he was sick. Sonny and Billie did not have any children together, but Sonny remained close to Billie's daughter, Tammy Newman (hereinafter "Newman"). In fact, Newman lived in a house that Sonny owned. After Sonny died, Newman became the sole owner of the house through a survivorship deed.

**{¶3}** Sonny also owned a pain management clinic (hereinafter the "Clinic") in Wheelersburg, Ohio. Newman worked at the Clinic doing "day-to-day" things. It is not entirely clear, but Newman (and perhaps Billie) may have obtained an ownership interest in the Clinic after Sonny died. Regardless, after Sonny's death, the Clinic was sold to Newman's uncle for $6,000. Newman continued to work at the Clinic after it was sold. (At trial, Hankison's counsel tried to insinuate that Newman had a motive to kill Sonny because Newman inherited the house and at least a share of the Clinic. However, there is *no evidence whatsoever* that Newman had anything to do with Sonny's murder.)

**{¶4}** Hankison was a patient at the Clinic. In addition, Sonny and Hankison were apparently friends, as Sonny had done numerous favors for Hankison over the years.

**{¶5}** At the time of Sonny's murder, Hankison was on probation. Hankison was not married, but he shared a trailer with Emily Dees (hereinafter "Dees").

Both Hankison and Dees have a history of drug abuse. Hankison has taken pain medication for most of his adult life, and he has admitted to being addicted to Oxycontin. Jillian Mosley (hereinafter "Mosley") is Dees's daughter. Mosley testified that, during the month of March, Hankison was mainlining Oxycontin and "had been hitting [it] really hard." Transcript at 213. Like Hankison and Dees, Mosley also has a history of drug abuse.

## B. The Night of Sonny's Murder

{¶6} On March 29, 2009, Sonny attended a birthday party at Newman's house. He left the party shortly after 7:00 p.m. Sonny told Billie that he would be back shortly. Just before leaving, Sonny told Newman that he had to go meet a man named Mark Turner. Billie left the party "[a]bout 45 minutes or an hour" after Sonny did. Transcript at 53. Before she left, Billie discovered that Sonny had left his cell phone at Newman's house. So Billie took Sonny's cell phone with her. Later, it was discovered that Hankison left two voice mail messages for Sonny at approximately 7:00 p.m. In the first voice mail message, Hankison said, "I'm down here. Give me a holler. Waiting, what's going on?" Transcript at 474. And in the second message, Hankison said, "It's cold down here. I'll be back up the trailer waiting." Transcript at 474. The two calls came from Hankison's telephone number, and numerous witnesses identified Hankison's voice in the messages.

{¶7} Sonny left the party and then drove his truck to Hankison's trailer. Although the evidence is not entirely clear, Sonny may have had some Oxycontin pills on his person or in his truck. At trial, Dees testified that she (1) saw Sonny's

truck in front of her trailer, (2) made brief eye contact with Sonny, and then (3) yelled that Hankison would be right out. As Hankison was leaving the trailer, he inadvertently struck Dees with a long knife. Dees testified that Hankison then apologized, stuck the knife "down in his shirt or whatever he had on," and walked out the door. Transcript at 272.

{¶8}     Dees did not watch Hankison meet with Sonny, but she testified that Sonny's truck remained idling in front of the trailer for "a while." Transcript at 273. At trial, Dees described what happened next. "The truck pulled around back to the front porch and [Hankison] come up to the door, and I unlocked the screen door and the door – the front door. And he said 'Go get me my Carhartts.' And I just, and I said 'Are you all right?' I seen blood on his right leg and I said 'Are you all right,' and he said 'Just go get me my Carhartts.' And I went into the junk room and got him his Carhartts and gave it to him, and then he left." Transcript at 274-75. (Carhartt is a brand name for different types of work-related clothing. Throughout the trial, various witnesses referred to Hankison's bib overalls as "Carhartts.") Dees did not see Hankison put on the bib overalls, but she heard Sonny's truck leave the driveway. Dees then went to sleep after drinking some Theraflu.

{¶9}     Next, Hankison went to a local Super America gas station. According to the store's surveillance system, Hankison walked into the store at approximately 8:16 p.m. The store manager testified that Hankison was a regular customer. Several witnesses, including the store manager, identified Hankison from the store's surveillance video. The surveillance video also

recorded what appeared to be Sonny's truck in the parking lot. (At trial, the cashier from the Super America positively identified Hankison as the man who walked into the store at approximately 8:16 p.m. However, before trial, the cashier was shown a photo lineup of various suspects and identified a picture of somebody other than Hankison. Based on this discrepancy, Hankison's trial counsel insinuated that somebody might have dressed like Hankison in an effort to frame him.)

{¶10}    As Hankison walked into the Super America, the cashier noticed that Hankison "had a Carhartt jacket, Carhartt pants[, and] blood right here inside his coat." Transcript at 438. At trial, the cashier testified about his transaction with Hankison. "I gave [Hankison] a weird look like anybody would and [Hankison] told me he was giving birth to cattle that were breech. And that was it, and [Hankison] pre-paid $10.00 gas; I gave him his change and he went on about his business." Transcript at 439. During this transaction, the cashier "got a little speck of blood" on his hand. Transcript at 439. Then, Hankison left the store, filled a portable container with gas, and walked back towards the truck in the parking lot. According to the store's surveillance system, the truck pulled out of the parking lot at approximately 8:25 p.m.

{¶11}    At approximately 9:18 p.m., the following call was placed to 9-1-1:

{¶12}    "OPERATOR: 9-1-1.

{¶13}    "CALLER: Yes. There's a fire down here on Miller's Run Back Run down on the main road.

{¶14}    "OPERATOR: Okay. And what's on fire?

{¶15}    "CALLER: Well (inaudible) looked out the window and there's a car on fire down here by –

{¶16}    * * *

{¶17}    "OPERATOR: Okay.  So the car's on the road?

{¶18}    "CALLER: It's on the road and it's on fire."  Transcript at 125.

{¶19}    Sonny's truck was the automobile on fire, and the scene of the fire was a tenth-of-a-mile walk from Hankison's trailer.  Investigators later determined that gasoline was used as an accelerant in the truck fire.  After the fire was put out, a firefighter discovered Sonny's body in the passenger side of the truck.  A subsequent autopsy revealed that Sonny had been stabbed three times, twice in the neck and once in the chest.

{¶20}    After being gone for a while, Hankison returned to the trailer and awoke Dees.  At trial, Dees described what happened when Hankison returned.

{¶21}    "Q. And what did [Hankison] say?

{¶22}    "A. Excuse my language, but he said '[G--] damn it, get up and help me.  I have killed Sonny,' or 'I [f-----g] cut his head off.'  I can't remember which, but it was one or the other or both.

{¶23}    "Q. He said words to that effect.

{¶24}    "A. Yes.

{¶25}    "Q. Okay.  And what did you do?

{¶26}    "A. I got up.  And he said 'Get me a garbage bag,' and I went and got him a garbage bag, and that's when he started taking off his clothes and putting them in the garbage bag.

**{¶27}**      "Q. Okay.  And did you ask him anything, 'Why you did it,' or anything

of that nature?

**{¶28}**      "A. Yes, I did.

**{¶29}**      "Q. Okay.  And what did he say?

**{¶30}**      "A. Because Sonny come down to this courthouse and wrote a

statement on him.

**{¶31}**      "Q. Okay.  Did he say to this courthouse, or did he just say 'write a

statement'?

**{¶32}**      "A. Downtown, so I'd assume this courthouse.

**{¶33}**      "Q. Okay.  Did he say anything else about it?

**{¶34}**      "A. Just like if – like what do you mean?

**{¶35}**      "Q. Did you – did you ask him what statement or anything?

**{¶36}**      "A. I just didn't understand why he killed Sonny because Sonny was

good to him.

**{¶37}**      "Q. Okay.  And did he say 'Either him or me,' or –

**{¶38}**      "A. No, he just said 'Sonny signed a statement on me.  He was going

to send me back to the penitentiary.'

**{¶39}**      "Q. Okay.  Signed a statement on him and was going to send him back

to the penitentiary?

**{¶40}**      "A. Yes.

**{¶41}**      "Q. Now, did you say anything to him about the effect it had on you?

{¶42}     "A. I just said 'What if I would have went out there and seen that?  I would have been in Toledo State Mental Hospital.'  And he said 'No, I'd a had to kill you too.'

{¶43}     "Q. At that time did he say anything about what Sonny's response was?

{¶44}     "A. He just said that Sonny pleaded for his life and offered him, told him he'd go down with him to recant the statement and offered him, you know, I can't remember exactly, but it was $100 or $200,000.00 if he wouldn't do it.

{¶45}     "Q. Okay. Now were the Defendant's words that 'Sonny was begging for his life'?

{¶46}     "A. Yes.

{¶47}     "Q. Okay.  And that Sonny said he would recant and pay him $100 or $200,000.00 if he didn't kill him?

{¶48}     "A. Yes.

{¶49}     "Q. Now, at that time did the Defendant put anything out on the counter?

{¶50}     "A. Yeah.  He had a sack of money and a billfold.  And he just went through the billfold and kept the driver's license and threw the billfold and the – you know, I can't really say if he threw the billfold in the plastic sack.  I don't know.  I assume, but I seen Sonny's driver's license and I seen the stack of money.

{¶51}     "Q. Okay.

{¶52}     "A. That's all I seen.

**{¶53}** "Q. You saw there was Sonny's driver's license that came out of the wallet.

**{¶54}** "A. Yes, I did.  Yes, I did.

**{¶55}** "Q. And the stack of money, about how much money was it?  Could you estimate?

**{¶56}** "A. You know, it was – it was, you know, I don't know exactly.  It was maybe, you know what I mean?  It was a stack of money, so anywhere – I don't know, a few hundred dollars.

**{¶57}** "Q. I think when you said that you put your fingers –

**{¶58}** "A. Yeah, like a, you know about an inch, inch and a half.

**{¶59}** "Q. Okay. The stack was an inch, an inch and a half thick?

**{¶60}** "A. But it was rolled over.

**{¶61}** "Q. Okay.  Inch, inch and a half thick rolled over.

**{¶62}** "A. Yes.

**{¶63}** "Q. Okay.  Now what did he do with the money?

**{¶64}** "A. I guess he put it in his pocket.

**{¶65}** "Q. Okay.  Did – do you know what he was going to do about the – with the driver's license?

**{¶66}** "A. He was going to fly it off to some bottom, people, person in the bottoms to I guess put the crime off somebody in the bottoms of Lucasville.

**{¶67}**        * * *

**{¶68}** "Q. Now, did he say anything about the pills?

**{¶69}** "A. Yeah, he burnt the pills in the truck.

{¶70}     "Q. Okay.  Was he upset about that?

{¶71}     "A. He just was searching for them and searching and 'I burnt the pills in the truck.'"  Transcript at 276-280.

{¶72}     After leaving the trailer a second time, Hankison walked to his neighbor's house and asked for a ride into Lucasville.  The neighbor testified that Hankison had "like a wad [of] money when he was at my house. * * * It was like folded over. * * * About that thick. * * * About an inch and a half."  Transcript at 462.  The neighbor and his girlfriend agreed to drive Hankison to Lucasville.  First, they stopped at Hankison's place of employment, where Hankison talked to an unknown individual.  Then, they stopped at the Briar Patch convenience store.  According to the store's surveillance system, Hankison entered the Briar Patch at approximately 11:01 p.m.

{¶73}     Later that evening, Detective Paul Blaine (hereinafter "Detective Blaine") of the Scioto County Sheriff's Office met with Billie's family to discuss the truck fire.  During this meeting, Billie told Detective Blaine that she had Sonny's cell phone.  Billie gave the cell phone to Detective Blaine, and Detective Blaine was able to retrieve Sonny's voice mail messages.  Then, using a digital recorder, Detective Blaine recorded the messages that Hankison had left for Sonny.

C. The Subsequent Investigation

{¶74}     On April 1, 2009, investigators learned that Sonny had been stabbed before his truck was set on fire.  Investigators returned to the scene of the fire to search for a knife, but they could not find the murder weapon.

**{¶75}** Because of the voice mail messages, Hankison quickly emerged as the primary suspect in Sonny's murder. Detective Blaine and several other investigators went to Hankison's trailer to request an interview. While most of the investigators were inside the trailer with Hankison, an arson investigator noticed a "burn pile" to the right of the trailer. The burn pile included a boot or shoe and "what appeared to be the bottom leg of a Carhartts type material." Transcript at 165. Hankison agreed to go to the Scioto County Sheriff's office for an interview, during which Hankison was cooperative and admitted to being "hooked on Oxy's." Transcript at 482.

**{¶76}** Later, Detective Blaine and an arson investigator went to Mosley's apartment to question Mosley and Dees. After some initial questioning, the investigators split Mosley and Dees apart. Dees denied knowing anything about Sonny's murder, but Mosley told an arson investigator about Hankison's involvement. Dees had apparently told Mosley about Hankison's actions on the night of the murder, and Mosley relayed that story to the arson investigator. At trial, Mosley testified as follows:

**{¶77}** "Q. [H]ow did you know what happened?

**{¶78}** "A. Because my mom.

**{¶79}** "Q. Okay. Your mother told you.

**{¶80}** "A. What she told me. And I told [the arson investigator] everything that my mother had told me to save my mom. I didn't want to see her in Marysville." Transcript at 215.

{¶81}     Detective Blaine continued his interview with Dees at her trailer. Hankison and another man arrived at the trailer while Detective Blaine was there, and Dees said that "she did not want to go anywhere with [Hankison;] she was afraid that something was going to happen to her." Transcript at 487. So Detective Blaine left with Dees and drove her back to Mosley's apartment. As they were driving, Detective Blaine told Dees that he could give her a "computerized stress analysis." Transcript at 487. Dees responded that she would fail the test.

{¶82}     At Mosley's apartment, Dees finally agreed to discuss what she knew about Sonny's murder. Then, Mosley and Dees went to the Scioto County Sheriff's office to give their respective statements. Mosley explained that "[e]verything in [her] statement is what [Dees] told [her]" about Hankison's involvement in Sonny's murder. Transcript at 231.

{¶83}     Hankison was arrested shortly after Mosley and Dees gave their respective statements. Detective Blaine interviewed Hankison after the arrest, and Hankison denied any involvement in Sonny's murder. The interview ended when Hankison asked for a lawyer.

{¶84}     With Hankison in jail, Detective Blaine formulated a plan to obtain additional evidence. Detective Blaine wanted to get Dees a cell phone. According to the plan, Hankison would call Dees on the cell phone and, hopefully, incriminate himself. However, Dees refused to participate. She told Detective Blaine that she was afraid Hankison would kill her, or have someone kill her, if she went through with the plan. (At trial, Hankison's counsel insinuated

that Dees refused to participate because, if she talked to Hankison, it would show that Dees was lying.)

**{¶85}** On April 8, 2009, Dees called Detective Blaine about a bag of clothes that she had found in the trailer's "junk room." The trailer had already been searched several times, but investigators had not found this particular bag of clothes. Among other items, the bag contained a pair of sweatpants that apparently belonged to Hankison. Later DNA testing revealed that Sonny's blood was on the pair of sweatpants. (At trial, Hankison's counsel insinuated that the bag of clothes might have been planted in a scheme to frame Hankison.)

**{¶86}** On April 29, 2009, a Scioto County Grand jury indicted Hankison for aggravated murder, murder, aggravated robbery, aggravated arson, kidnapping, grand theft of an automobile, and two counts of tampering with evidence.

### D. Relevant Issues From the Trial

**{¶87}** Hankison's three-day trial began on September 21, 2009, and he was subsequently found guilty on all counts. On appeal, Hankison is claiming ineffective assistance of counsel. Therefore, for purposes of this opinion, we must highlight two relevant issues from Hankison's trial.

### 1. References to Hankison's Criminal Record

**{¶88}** As Hankison notes, the trial contained numerous references to Hankison either (1) being on probation or (2) having spent time in prison. For example, on redirect examination, Mosley testified that Hankison would sometimes "spot pills" for visits to his probation officer.

**{¶89}**     "Q. Okay. Now when you say 'spotting pills,' what do you mean?

**{¶90}**     "A. He had a friend that would give him his pill count before he would

went and go check in –

**{¶91}**     "Q. Okay.  So he could take the prescription pills in –

**{¶92}**     "A. Yeah.

**{¶93}**     "Q. – and show them –

**{¶94}**     "A. And he would say, 'Here.  Here's my bottle.  I have these,' and then

he'd have to take them and give them back to him.

**{¶95}**     "Q. Okay.  So that covered the ones that he already used.

**{¶96}**     "A. Yeah."  Transcript at 255-56.

**{¶97}**     Additionally, Mosley testified that Hankison and Dees started dating

when Hankison "got out of prison[.]"  Transcript at 221.

2. The Door Handles

**{¶98}**     On cross-examination, Hankison's trial counsel asked one of the arson

investigators about physical evidence from the crime scene.  The arson

investigator testified that nothing from the crime scene "would have had a viable

fingerprint on it after that fire."  Transcript at 196.  Then, Hankison's trial counsel

asked if there could have been fingerprints on the truck's door handle.  The arson

investigator replied that "[t]he door handles were almost completely destroyed by

the fire."  Transcript at 196.  At that point, Hankison's trial counsel produced door

handles that were allegedly found at the scene of the truck fire.  In a bench

conference, Hankison's trial counsel explained that he was "out [at the scene of

the truck fire on] Sunday and picked them up" and that a "neighbor across the

street saw [him] pick this up." Transcript at 197. (One of Hankison's neighbors later testified that he saw Hankison's trial counsel pick up "a piece of metal or aluminum or something" at the scene of the truck fire. Transcript at 465.)

**{¶99}** After the bench conference, the trial court judge addressed the jury: "I'm just going to tell the jury what's going on here. Okay? We're supposed to tell each other what evidence we're going to use ahead of time. Okay? [Hankison's trial counsel] is making a representation to this Court that he was out there Sunday?

**{¶100}** "[HANKISON'S TRIAL COUNSEL]: Yesterday.

**{¶101}** "THE COURT: Okay, Sunday. And he found these handles at the scene. There's nothing to support that these came from [Sonny's] truck; there's nothing to support where they came from. So since he's standing there showing them to you, I can't make them un-show it. All right? But normally this is not something that can be introduced into evidence. Okay? It's just this isn't the way we do things. But you've already seen it; I can't take [it] out of the bag and put it back in the bag. So whatever it's worth, I'm going to let [Hankison's trial counsel] show them that. And you've seen it and you take it for whatever it's worth." Transcript at 199.

## E. Assignments of Error

**{¶102}** Hankison appeals from his judgment of conviction and asserts the following assignment of error: I. "The performance of trial counsel was deficient, and deprived Mr. Hankison of the right to effective assistance of counsel

guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution."

II.

**{¶103}** In his sole assignment of error, Hankison contends that he received ineffective assistance of counsel. Hankison claims ineffective assistance for the following reasons: (1) trial counsel did not object to various hearsay statements; (2) the introduction of the door handles was not an approach that competent counsel would have followed; (3) competent counsel would have objected to any suggestion that Hankison had a criminal record; and (4) trial counsel raised the fact that Hankison invoked his right to remain silent.

**{¶104}** "In Ohio, a properly licensed attorney is presumed competent and the appellant bears the burden to establish counsel's ineffectiveness." *State v. Norman*, Ross App. Nos. 08CA3059 & 08CA3066, 2009-Ohio-5458, at ¶65 (internal quotations omitted); see, also, *State v. Wright*, Washington App. No. 00CA39, 2001-Ohio-2473; *State v. Hamblin* (1988), 37 Ohio St.3d 153, 155-56, cert. den. *Hamblin v. Ohio* (1988) 488 U.S. 975. To secure reversal for the ineffective assistance of counsel, one must show two things: (1) "that counsel's performance was deficient * * * " which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[;]" and (2) "that the deficient performance prejudiced the defense * * *[,]" which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington* (1984), 466 U.S. 668, 687. See, also,

*Norman* at ¶65.  "Failure to satisfy either prong is fatal as the accused's burden requires proof of both elements."  *State v. Hall*, Adams App. No. 07CA837, 2007-Ohio-6091, at ¶11, citing *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, at ¶205.

A. Overview

**{¶105}**     In considering Hankison's various arguments, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Strickland* at 689 (internal quotation omitted).  "Moreover, the strategic decision of a trial attorney will not form the basis of a claim of ineffective assistance of counsel, even if there may have been a better strategy available."  *State v. Komora* (Apr. 4, 1997), Geauga App. No. 96-G-1994, citing *State v. Clayton* (1980), 62 Ohio St.2d 45, 49.

**{¶106}**     Before we begin our analysis, we note that the evidence against Hankison is overwhelming.  Therefore, we must view trial counsel's actions in light of the overwhelming evidence of guilt.  Trial counsel had a limited number of strategies or tactics to choose from.  And after reviewing the record, we believe that trial counsel represented Hankison in a zealous and competent manner.

**{¶107}**     Here, trial counsel's defense strategy can be boiled down to three distinct propositions: (1) Dees fabricated her story about Hankison's involvement in Sonny's murder; (2) Hankison had no motive to kill Sonny (while other people

did); and (3) somebody framed Hankison.  Based on these three propositions, all of Hankison's complained-of actions were reasonable strategic decisions.

## B. Hearsay Evidence

**{¶108}**     Hankison claims that both Mosley's testimony and Detective Blaine's testimony contained inadmissible hearsay.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Evid.R. 801(C).  Furthermore, "[h]earsay is not admissible except as otherwise provided by [law or rule]."  Evid.R. 802.

## 1. Mosley's Testimony

**{¶109}**     Regarding the events of March 29, 2009, Mosley testified about things that Dees had told her – namely, Dees's account of Hankison's involvement in Sonny's murder.  Additionally, Mosley testified about things that Hankison had told Dees, who in turn relayed Hankison's statements to Mosley (hearsay within hearsay).  Hankison contends that his trial counsel "rendered deficient performance when he allowed Ms. Mosley's inadmissible [hearsay] testimony to be presented without objection[.]"  Merit Brief of Nelson Hankison at 12.

**{¶110}**     "[F]ailure to object, standing alone, is insufficient to sustain a claim of ineffective assistance of counsel. * * * Furthermore, a failure to object may be justified solely as a tactical decision."  *State v. Bennett*, Ashtabula App. No. 2002-A-0020, 2005-Ohio-1567, at ¶70 (citations omitted).  See, also, *State v. Leonard*, Athens App. No. 08CA24, 2009-Ohio-6191, at ¶65-67; *State v. Roby*,

Putnam App. No. 12-09-09, 2010-Ohio-1498, at ¶44. Here, we believe that not objecting to Mosley's testimony constituted a reasonable trial strategy.

**{¶111}** Hankison's trial counsel had to attack Dees's credibility. Indeed, the jury had to disbelieve Dees's testimony for Hankison's defense to have any chance of success. And throughout the trial, defense counsel hoped to cast doubt on Dees's testimony by pointing out the inconsistencies in her various statements. For example, in a prior statement, Dees claimed that she did not actually see Sonny's truck in front of her trailer. But at trial, Dees testified that she did indeed see Sonny's truck and even made eye contact with Sonny. Dees also offered inconsistent statements regarding the amount of blood on Hankison's clothes and the amount of money Hankison took from Sonny. To point out these inconsistencies, statements other than Dees's trial testimony had to be introduced into evidence. By not objecting to Mosley's testimony, Hankison's trial counsel allowed the jury to hear another version of Dees's story. Mosley's direct testimony did not include any references to Sonny "writing statements" on Hankison, Sonny begging for his life, or Sonny offering Hankison money not to kill him. Hankison's trial counsel was able to question Mosley about some of these omissions. And in contrast to Dees's testimony, Hankison's trial counsel could hope that Mosley's testimony would highlight the ways in which Dees's story had changed.

**{¶112}** Furthermore, by not objecting to Mosley's testimony, Hankison's trial counsel was able to cross-examine Mosley about possible motives. As Hankison's trial counsel asked, "Now, in this statement there's one thing I don't

see in the statement, and that is why you claim, or why did [Hankison] kill Sonny.

Did your mom tell you why?" Transcript at 248. Mosley testified that she

believed Hankison's "motive was the pills and the cash." Transcript at 248.

**{¶113}** Throughout the trial, Hankison's trial counsel tried to establish that

Hankison had no motive to kill Sonny. Dees claimed that Hankison said he killed

Sonny because Sonny had given statements that would send Hankison back to

prison, but the prosecution did not produce any of these alleged statements.

Mosley claimed that Hankison killed Sonny for drugs and money. In response,

Hankison's trial counsel could argue (1) that the killer left any potential drugs in

Sonny's truck and (2) that Sonny had lent money to Hankison in the past. For

these reasons, defense counsel could later argue that other individuals (such as

Newman) may have had a stronger motive to kill Sonny.

2. Detective Blaine's Testimony

**{¶114}** Hankison also contends that his trial counsel should have objected to

Detective Blaine's testimony. Detective Blaine testified about several things that

Dees had told him, including statements related to the potential computerized

stress analysis. According to Hankison, "[c]ompetent counsel would have

opposed Detective Blaine's recounting of numerous critical statements from the

State's most important witness, due to the significant effect that such repetition

would have had with respect to bolstering Ms. Dees' credibility." Merit Brief of

Nelson Hankison at 9.

**{¶115}** Here, Hankison must establish that any potential hearsay objections

would have had merit because the "failure to raise meritless issues does not

constitute ineffective assistance of counsel." *Norman* at ¶69 (internal quotation omitted). However, Hankison has not attempted to establish that Detective Blaine's testimony actually contained inadmissible hearsay. Instead, Hankison merely calls Detective Blaine's testimony "improper." As such, Hankison has not demonstrated that his trial counsel erred in regards to Detective Blaine's testimony. Furthermore, assuming that Detective Blaine's testimony did contain inadmissible hearsay, we would find that failing to object was a reasonable trial strategy. Again, by eliciting additional statements made by Dees, Hankison's trial counsel could hope to point out any variations and attack Dees's credibility.

### 3. Prejudicial Effect

{¶116}     Finally, even if we were to find that Hankison's trial counsel erred in relation to inadmissible hearsay, we could not find that the errors were prejudicial. Here, Dees testified at length about Hankison's actions on March 29, 2009. And after a vigorous cross-examination, the jury obviously found Dees's testimony to be credible. Moreover, in addition to Dees's testimony, the evidence of Hankison's guilt is overwhelming. Therefore, Hankison cannot demonstrate that he was deprived of a fair trial, a trial whose result is reliable, because of the hearsay-related issues.

{¶117}     Accordingly, we find no merit in Hankison's hearsay-related arguments.

### C. The Door Handle Incident

{¶118}     At trial, Hankison's trial counsel produced door handles that were allegedly found at the scene of the truck fire. Hankison contends that "[t]he

manner in which the door handles were introduced, which caused the court to address the jury regarding the impropriety thereof, was not an approach that competent counsel would have followed.  And, as to whether they should have been introduced at all, after purportedly being exposed to the elements for six months, there was literally no evidentiary value whatsoever that could have been attached to the door handles that counsel sought to have the jury consider." Merit Brief of Nelson Hankison at 10.

{¶119}    We agree that Hankison's trial counsel introduced the door handles in a highly unorthodox manner.  However, we once again note that trial counsel had to mount Hankison's defense against overwhelming evidence.  While questioning the arson investigator, trial counsel highlighted the fact that no physical evidence linked Hankison to the crime scene.  And throughout the trial, defense counsel insinuated that Hankison had been framed and that authorities should have investigated the crime more thoroughly.  With this in mind, trial counsel might have reasonably believed that introducing the door handles would bolster any theories related to the thoroughness of the investigation.  This interpretation is all the more reasonable considering that investigators did not find the bag of clothes despite several searches of Hankison's trailer.

{¶120}    Regardless, even if trial counsel did err by introducing the door handles, we could not find that the error was prejudicial.  Hankison has not even attempted to demonstrate that the introduction of the door handles somehow deprived him of a fair trial.

**{¶121}** Accordingly, we find no merit in Hankison's door-handle-related argument.

D. References to Hankison's Criminal Record

**{¶122}** Hankison contends that his trial counsel should have objected to any reference that Hankison either was on probation or had spent time in prison. To support his argument, Hankison cites *State v. Allen* (1987), 29 Ohio St.3d 53.[1] In *Allen*, the Supreme Court of Ohio noted that "[t]he existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to the jury unless specifically permitted under statute or rule. The undeniable effect of such information is to incite the jury to convict based on past misconduct rather than restrict their attention to the offense at hand." Id. at 55. As such, Hankison contends that "[c]ompetent counsel would have strenuously objected to any testimony that suggested that Mr. Hankison had prior convictions, and Mr. Hankison's defense counsel's failure to do so constitutes deficient performance." Merit Brief of Nelson Hankison at 11. However, we find (1) that Hankison's trial counsel failed to object for strategic reasons and (2) that in light of the overwhelming evidence against Hankison, the failure to object was not prejudicial.

**{¶123}** Here, there were no references to any specific crime that Hankison might have committed. Instead, there were only references to Hankison being on

---

[1] We note that *Allen* addresses "whether the existence of a prior conviction is an essential element of the offense where that previous conviction affects only the penalty and does not enhance the degree of the offense itself." Id. at 54. Therefore, the holding in *Allen* is not particularly relevant to the present case.

probation and having spent time in prison.  Further, we also note the following objection during Mosley's testimony:

**{¶124}** "Q. Okay.  For how long a period of time was [Hankison] addicted to Oxycontin?

**{¶125}** "A. He quit when he did 100 and some days in jail.  When he got back out at home it started again.

**{¶126}** "Q. In your observation when did he begin?

**{¶127}** "A. After he got out of prison it was –

**{¶128}** "[HANKISON'S TRIAL COUNSEL]: Objection, Your Honor.  Move to strike.

**{¶129}** * * *

**{¶130}** "THE COURT: The last statement that the witness made, I'm ordering you to disregard it and not consider it for any purpose.  Okay?  That's not what we're here for today."  Transcript at 207-08.

**{¶131}** Thus, defense counsel did object to one of the initial references to Hankison's criminal history.  From that point forward, trial counsel "could reasonably have decided against raising an objection * * * for fear that an objection would only call the jury's attention to [Hankison's criminal record.]" *Leonard* at ¶67, quoting *State v. Patrick* (Sept. 8, 1994), Lawrence App. No. 94CA02.

**{¶132}** Furthermore, in an attempt to discredit a possible motive, trial counsel engaged in a reasonable trial strategy by referencing Hankison's status as a probationer.  One theory of the crime is that Hankison killed Sonny for drugs,

specifically Oxycontin.  Trial counsel tried to discredit this theory during the

cross-examination of Detective Blaine.  During cross-examination, trial counsel

asked Detective Blaine if he knew that Hankison's probation officer "give[s]

periodic drug tests, drug screens to his probationers[, and] that people that don't

– that abuse drugs on probation end up back in front of Judge Marshall."

Transcript at 556.  The prosecution objected to this line of questioning, but the

implication was clear.  Trial counsel hoped to demonstrate that Hankison was not

a drug addict, thereby casting doubt on a possible motive for Sonny's murder.

Because trial counsel himself referenced Hankison's probation, and because this

was a reasonable trial strategy, trial counsel would have accomplished nothing

by objecting to every vague reference to Hankison's criminal history.

{¶133}    Finally, in this regard, Hankison has not demonstrated that he was

deprived of a fair trial because of defense counsel's failure to object.  And in light

of the overwhelming evidence of guilt, we cannot find that Hankison was

prejudiced by any references to his criminal history.

{¶134}    Accordingly, we find no merit in Hankison's criminal-history-related

arguments.

E. Hankison Invoking His Right to Silence

{¶135}    At trial, defense counsel noted that Detective Blaine's post-arrest

interview with Hankison ended when Hankison asked for a lawyer.  For that

reason, Hankison cites *Doyle v. Ohio* (1976), 426 U.S. 610, which essentially

stands for the proposition that "a defendant's post[-]arrest silence cannot be used

against him at trial."  *State v. Holmes*, 181 Ohio App.3d 397, 2009-Ohio-1241, at

¶34. As such, Hankison contends that "there was absolutely nothing to be gained by informing the jury that Mr. Hankison had 'taken the Fifth' during the second interrogation, and for defense counsel to call attention to that fact was highly improper." Merit Brief of Nelson Hankison at 8.

{¶136} First, it is well settled that *Doyle* does not apply when *defense counsel* raises the defendant's post-arrest silence. See *State v. Reed*, Franklin App. No. 08AP-20, 2008-Ohio-6082, at ¶19-22. Therefore, any reliance on *Doyle* is misplaced. Furthermore, in *Reed*, the Tenth District Court of Appeals rejected a similar ineffective-assistance-of-counsel argument. By eliciting information about the defendant's post arrest silence, the *Reed* court found that defense counsel had engaged in reasonable trial tactics. See id. at ¶23-25.

{¶137} Here, especially in light of the overwhelming evidence of guilt, we believe that Hankison's trial counsel also engaged in a reasonable trial strategy. Trial counsel hoped to show that Hankison was indignant upon being accused of Sonny's murder. During Detective Blaine's cross-examination, trial counsel asked the following question: "[Hankison] tells you in no – in emphatic words several times in the interview 'I know one thing for certain, I did not kill Sonny Hamilton,' correct?" Transcript at 557. Detective Blaine replied, "Correct." Transcript at 557. To bolster Hankison's denials, trial counsel attempted to portray Hankison asking for a lawyer as an act of indignation. Trial counsel engaged in a reasonable trial strategy, and we will not "second guess those strategic choices through hindsight." *State v. Love*, Ross App. No. 05CA2838,

2006-Ohio-1824, at ¶49, citing *Strickland* at 689.  This is especially true considering the limited options available to Hankison's trial counsel.

**{¶138}**     Finally, Hankison has not demonstrated that he was deprived of a fair trial because of trial counsel's references to the post-arrest interview.  And in light of the overwhelming evidence of guilt, we cannot find that Hankison was prejudiced by any references to his post-arrest silence.

**{¶139}**     Accordingly, we find no merit in Hankison's fourth argument.  Having found no merit in any of Hankison's arguments, we overrule his assignment of error and affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and Appellant pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

McFarland, P.J. and Harsha, J.:  Concur in Judgment and Opinion.

For the Court

BY:  _____
Roger L. Kline, Judge

### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**